UNITED STATES of America, Plaintiff,

v.

Manuel Antonio NORIEGA, Defendant.

No. 88–79–Cr.

United States District Court,
S.D. Florida.

Dec. 8, 1992.

Michael P. Sullivan, Guy Lewis, Asst. U.S. Attys., Miami, FL, for plaintiff.

Frank A. Rubino, Jon May, Coconut Grove, FL, for defendant.

## RECOMMENDATION

HOEVELER, Senior District Judge.

THIS CAUSE comes before the Court again with another unique question, this time incident to sentencing. Ordinarily, the Court can do no more than recommend the place and/or institutional level of confinement for convicted defendants. At sentencing, the question of General Noriega's prisoner of war status as that status relates to confinement was raised, and the parties were afforded time to submit memoranda, which they did. Argument was heard on November 13, 1992.

Subsequent to argument, Human Rights Watch was permitted to file a Motion for Leave to Submit an *Amicus Curiae* Memorandum and coincident to the Motion, presented the Memo. The Court granted the Motion and has considered the well-developed presentation of Human Rights Watch. Indeed, each of the parties has carefully and exhaustively presented positions on the problem facing the Court.

Defendant contends that the Geneva Convention Relative to the Treatment of Prisoners of War ("Geneva III"), August 12, 1949, 6 U.S.T. 3316, T.I.A.S. No. 3364, 75 U.N.T.S. 135,[1] is applicable law that the Court must recognize. Defendant urges further that whether or not the U.S. government classifies General Noriega as a prisoner of war ("POW"), he is one, in fact, and must be afforded all the benefits of that status.

Before the Court are several questions, but the ultimate one appears to be whether or not the Geneva Convention prohibits incarceration in a federal penitentiary for a prisoner of war convicted of common crimes against the United States.[2] To resolve this issue the Court must consider three interrelated questions: 1) what authority, if any, does the Court have in this matter; 2) is Geneva III applicable to this case; 3) if so, which of its provisions apply to General Noriega's confinement and what do they require?

## I. AUTHORITY OF THE COURT

The Court is presented with an unusual question about the scope of its own authority—namely, does a court retain any power to decide an issue relating to confinement arising in a case after the defendant has already been tried, convicted, sentenced, and an appeal taken? The Court and the government have expressed serious reservations about the Court's authority in this regard.[3] Defendant has taken the position that the sentencing is not completed until this issue has been determined and made the subject of a formal order, either by inclusion in the Judgment & Commitment or otherwise.

Because of the unique nature of this case and the presence of important questions of international law, the Court afforded the parties an opportunity to file post-sentencing memoranda. Having considered the memoranda submitted, the argument of counsel, and all other materials relevant to this inquiry, the Court has concluded that it lacks the authority to order the Bureau of Prisons ("BOP") to place General Noriega in any particular facility. However, as with all sentencing proceedings, it is clearly the right—and perhaps the duty—of this Court to make a recommendation that the BOP place Noriega in a facility or type of facility the Court finds most appropriate given the circumstances of the case. The Court takes this responsibility quite seriously, especially in the novel situation presented here where the defendant is both a convicted felon and a prisoner of war. This dual status implicates important and previously unaddressed questions of inter-

---

**1.** All citations in this opinion to "Articles" refer to the various Articles of Geneva III.

**2.** Defendant originally argued that it was within this Court's authority to order that Defendant be remanded to the Department of Defense rather than the Bureau of Prisons to serve his sentence in a military facility. Finding no legal authority for such an order in anything presented to the Court by Defendant or through independent research efforts, the Court rejected this argument at the post-sentencing hearing on November 13, 1992.

**3.** *See* Sentencing Transcript, July 10, 1992 at 94, 95 (Court) & 18–20 (gov't); Post–Sentencing Hearing Transcript, Nov. 13, 1992 at 8–9, 42, 45, 47–48 (Court) & 22–23, 28–29, 35–36 (gov't).

national law that the Court must explore if it hopes to make a fair and reasoned recommendation on the type of facility in which the General should serve his sentence.

## II. APPLICABILITY OF GENEVA III

Before examining in detail the various provisions of Geneva III, the Court must address whether the treaty has any application to the case at bar. Geneva III is an international treaty designed to protect prisoners of war from inhumane treatment at the hands of their captors. Regardless of whether it is legally enforceable under the present circumstances, the treaty is undoubtedly a valid international agreement and "the law of the land" in the United States. As such, Geneva III applies to any POW captured and detained by the United States, and the U.S. government has—at minimum—an international obligation to uphold the treaty. In addition, this Court believes Geneva III is self-executing and provides General Noriega with a right of action in a U.S. court for violation of its provisions.

### A. Noriega's Prisoner of War Status

The government has thus far obviated the need for a formal determination of General Noriega's status. On a number of occasions as the case developed, counsel for the government advised that General Noriega was being and would continue to be afforded all of the benefits of the Geneva Convention. At no time was it agreed that he was, in fact, a prisoner of war.[4]

The government's position provides no assurances that the government will not at some point in the future decide that Noriega is *not* a POW, and therefore not entitled to the protections of Geneva III.[5] This would seem to be just the type of situation Geneva III was designed to protect against. Because of the issues presented in connection with the General's further confinement and treatment, it seems appropriate—even necessary—to address the issue of Defendant's status. Articles 2, 4, and 5 of Geneva III establish the standard for determining who is a POW. Must this determination await some kind of formal complaint by Defendant or a lawsuit presented on his behalf? In view of the issues presently raised by Defendant, the Court thinks not.

### ARTICLE 2

[T]he present Convention shall apply to all cases of declared war or of *any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them.*

The Convention shall also apply to all cases of partial or total occupation of the

---

**4.** *See* Gov't Resp. to Def.Sent.Memo., Jul. 9, 1992 at 2–3, 15 ("the government will not dispute for these purposes defendant's contention that he is entitled to the protections accorded to prisoners of war under the Geneva Convention.... Defendant's status as a prisoner of war is not an issue; he has been accorded the status of a prisoner of war."); Letter from the State Dep't to the Attorney General of the United States, Jan. 31, 1990 ("the Department of State and the Department of Defense ... agreed that all individuals captured during the hostilities would be provided the protections normally accorded to prisoners of war until their precise status could be determined. The same Departments subsequently decided that these protections should be provided to any members of the PDF [Panamanian Defense Forces] who fell into U.S. hands until their final release and repatriation even if they might not be entitled to these protections under the terms of Article 4 of Geneva Convention III."); Dep't of the Army Memo. of Law, Mar. 29, 1990 ("the United States has made no

formal decision with regard to whether or not General Noriega and former members of the PDF charged with pre-capture offenses are prisoners of war, but has stated that each will be provided all prisoner of war protections afforded by the law of war."); Gov't Resp. to Def.Post–Hearing Memo. of Law, Sept. 29, 1992 at 8 ("Defendant enjoys, and will continue to benefit from, the full panoply of [Geneva Convention] provisions" even if incarcerated in a federal penitentiary); Gov't Resp. to Def. Noriega's Challenge to Court's Jurisdiction, Feb. 2, 1990 at 5–6 ("the government intends to provide prisoner of war treatment to Noriega").

**5.** There appears to be some cause for concern about the government changing its position. After consistently stating that the General has been, and will continue to be, treated as a POW, the Court detected a slight shift in the government's argument at the post-sentencing hearing. *See* Post–Sentencing Hearing Transcript, Nov. 13, 1992 at 26–28, 35–42.

territory of a High Contracting Party.... (emphasis added)

■ The Convention applies to an incredibly broad spectrum of events. The government has characterized the deployment of U.S. Armed Forces to Panama on December 20, 1989 as the "hostilities" in Panama. *Letter from the State Dep't to the Attorney General of the United States, Jan. 31, 1990 at 1.* However the government wishes to label it, what occurred in late 1989–early 1990 was clearly an "armed conflict" within the meaning of Article 2. Armed troops intervened in a conflict between two parties to the treaty. While the text of Article 2 itself does not define "armed conflict," the Red Cross Commentary to the Geneva Conventions of 1949 [6] states that:

Any difference arising between two states and leading to the intervention of members of the armed forces is an armed conflict within the meaning of Article 2.... It makes no difference how long the conflict lasts, how much slaughter takes place, or how numerous are the participating forces; it suffices for the armed forces of one Power to have captured adversaries falling within the scope of Article 4.

*Commentary* at 23 (footnote omitted).

In addition, the government has professed a policy of liberally interpreting Article 2:

The United States is a firm supporter of the four Geneva Conventions of 1949.... As a nation, we have a strong desire to promote respect for the laws of armed conflict and to secure maximum legal protection for captured members of the U.S. Armed Forces. Consequently, the United States has a policy of applying the Geneva Conventions of 1949 whenever armed hostilities occur with regular foreign armed forces, even if arguments

could be made that the threshold standards for the applicability of the Conventions contained in common Article 2 are not met. In this respect, we share the views of the International Committee of the Red Cross that Article 2 of the Conventions should be construed liberally.

*Letter from the State Dept. to the Attorney General of the United States, Jan. 31, 1990 at 1–2.*

## ARTICLE 4

A. Prisoners of war, in the sense of the present Convention, are persons belonging to one of the following categories, who have fallen into the power of the enemy:

(1) Members of the armed forces of a Party to the conflict....

■ Geneva III's definition of a POW is easily broad enough to encompass General Noriega. It is not disputed that he was the head of the PDF, and that he has "fallen into the power of the enemy." Subsection 3 of Article 4 states that captured military personnel are POWs even if they "profess allegiance to a government or an authority not recognized by the Detaining Power."

## ARTICLE 5

The present Convention shall apply to the persons referred to in Article 4 from the time they fall into the power of the enemy and until their final release and repatriation.

Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

---

**6.** 3 International Committee of the Red Cross, *Commentary on the Geneva Conventions,* (J. Pictet, ed., 1960) (hereinafter *"Commentary"*). While the Red Cross Commentary is not part of the treaty and is not binding law, it is widely recognized as a respected authority on interpretation of the Geneva Conventions. The authors of the Commentary were primarily individuals intimately involved with the revision of the Convention of 1929 and the drafting of the present Conventions. For all of its efforts to downplay the persuasive value of the Commentary when invoked by Noriega, the government itself has cited to the Commentary when favorable to its position.

■ An important issue raised by the last two words of Article 5 is, of course, what *is* a "competent tribunal"? Counsel for the government has suggested that, while he does not know what a competent tribunal as called for in Article 5 is, perhaps the answer lies in Article 8, which states in relevant part that "[t]he present Convention shall be applied with the cooperation and under the scrutiny of the Protecting Powers [7] whose duty it is to safeguard the interests of the Parties to the conflict." Nowhere in this language is there any indication that one of the rights or duties of the Protecting Powers is to make POW status determinations. Rather, it seems clear that their purpose is to facilitate and monitor appropriate treatment of POWs.

During the Geneva III drafting process, the phrase "military tribunal" was considered in place of "competent tribunal." The drafters rejected this suggestion, however, feeling that "to bring a person before a military tribunal might have more serious consequences than a decision to deprive him of the benefits afforded by the Convention." *Commentary* at 77 (citing II–A Final Record of the Diplomatic Conference of Geneva of 1949, at 388). Clearly, there was concern on the part of the drafters that whatever entity was to make determinations about POW status would be fair, competent, and impartial.

■ The Court acknowledges that conducting foreign policy is generally the province of the Executive branch. Whether or not the determination of an individual's status as a prisoner of war is a political question is a sub-issue which probably calls for an equivocal answer. While the Court believes that the question of prisoner of war status properly presented can be decided by the Court, this conclusion, in the present setting does beg the question of whether the issue is "properly presented" here. Passing for the moment the facts that an appeal has been taken and that to this point, at least, no violation of Geneva

III is evident, the Court feels and so determines it has the authority to decide the status issue presented. This is not to say that the Executive branch cannot determine this issue under other circumstances. The Court does suggest that where the Court is properly presented with the problem it is, under the law, a "competent tribunal" which can decide the issue. With that in mind, the Court finds that General Noriega is in fact a prisoner of war as defined by Geneva III, and as such must be afforded the protections established by the treaty, regardless of the type of facility in which the Bureau of Prisons chooses to incarcerate him.

## B. "Law of the Land"

■ The Geneva Convention applies to this case because it has been incorporated into the domestic law of the United States. A treaty becomes the "supreme law of the land" upon ratification by the United States Senate. U.S. Const. art. VI, cl. 2. Geneva III was ratified by a unanimous Senate vote on July 6, 1955. 101 Cong.Rec. 8537 (daily ed. July 6, 1955). Thus, Geneva III is a properly ratified treaty which the United States must uphold. The government acknowledges that Geneva III is "the law of the land," but questions whether that law is binding and enforceable in U.S. courts.

## C. Enforcement

If the BOP fails to treat Noriega according to the standard established for prisoners of war in Geneva III, what can he do to force the government to comply with the mandates of the treaty?

### 1. Article 78 Right of Protest

There are potentially two enforcement avenues available to a POW who feels his rights under the Geneva Convention have been violated. The first is the right to complain about the conditions of confinement to the military authorities of the Detaining Power or to representatives of the

---

**7.** Protecting Powers are neutral third parties whose job it is to ensure that a POW's rights under the Convention are respected by the De-

taining Power, especially in the absence of appropriate action by the POW's Power of Origin (his home state).

Protecting Power or humanitarian organizations. This right is established in Article 78 of Geneva III, and cannot be renounced by the POW or revoked or unnecessarily limited by the Detaining Power. *See* Articles 5, 7, 78, 85.

### ARTICLE 78

Prisoners of war shall have the right to make known to the military authorities in whose power they are, their requests regarding the conditions of captivity to which they are subjected.

They shall also have the unrestricted right to apply to the representatives of the Protesting Powers either through their prisoners' representative or, if they consider it necessary, direct, in order to draw their attention to any points on which they may have complaints to make regarding their conditions of captivity.

These requests and complaints shall not be limited nor considered to be a part of the correspondence quota referred to in Article 71. They must be transmitted immediately. Even if they are recognized to be unfounded, they may not give rise to any punishment.

Prisoners' representatives may send periodic reports on the situation in the camps and the needs of the prisoners of war to the representatives of the Protecting Powers.

In theory, by calling attention to violations of the Convention the prisoner of war will embarrass the government into rectifying any unacceptable conditions to which he is being subjected. However, the obvious weakness of this complaint procedure is that it has no real teeth. Incentive for the government to comply with the treaty stems from its eagerness to be looked upon favorably by others, and, it is hoped, from its desire simply to do what is proper under the circumstances. However, if we truly believe in the goals of the Convention, a

more substantial and dependable method must also be available, if necessary, to protect the POW's rights. Recourse to the courts of the Detaining Power seems an appropriate measure, where available.

### 2. Legal Action a in U.S. Court

A second method of enforcing the Convention would be a legal action in federal court. The government has maintained that if General Noriega feels that the conditions in any facility in which BOP imprisons him do not meet the Geneva III requirements, he can file a *habeas corpus* action under 28 U.S.C. § 2255. However, the government also argues that Geneva III is not self-executing, and thus does not provide an individual the right to bring an action in a U.S. court. Considered together, these two arguments lead to the conclusion that what the government is offering General Noriega is a hollow right. According to the government's position, Noriega could file a § 2255 claim, but any attempt to base it on violations of the Geneva Convention would be rejected because the General would not have standing to invoke the treaty.

The doctrine of self-execution has been called "one of the most confounding" issues in treaty law. *United States v. Postal*, 589 F.2d 862, 876 (5th Cir.1979), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). It is complex and not particularly well understood. A thorough discussion of the doctrine and its application to Geneva III would be both premature and unworkable in the context of this opinion. However, the Court wishes to dispel the notion that it already decided that Geneva III is not self-executing, and would add that given the opportunity to address this issue in the context of a live controversy, the Court would almost certainly hold that the majority of provisions of Geneva III are, in fact, self-executing.[8]

8. "Some provisions of an international agreement may be self-executing and others non-self-executing." Restatement (Third) Foreign Relations Law of the United States § 111 cmt. h (1986). Article 129 of Geneva III is clearly non-self-executing, as it calls for implementing legislation; however, the remainder of the provi-

sions do not expressly or impliedly require any action by Congress, other than ratification by the Senate, to take effect. Article 129 states that "[t]he High Contracting Parties undertake to enact any legislation necessary to provide effective penal sanctions for persons committing, or ordering to be committed, any of the grave

■ Essentially, a self-executing treaty is one that becomes domestic law of the signatory nation without implementing legislation, and provides a private right of action to individuals alleging a breach of its provisions. *Postal*, 589 F.2d at 875–77. Thus, even though Geneva III is undoubtedly "the law of the land," is not necessarily binding on domestic courts if the treaty requires implementing legislation or does not provide an individual right of action. The most difficult situations arise in relation to treaties like Geneva III which have no U.S. implementing legislation, leaving it for the courts to decide whether the treaty is the type that may function without it.

While the courts have generally presumed treaties to be nonself-executing in the absence of express language to the contrary, the Restatement would find treaties to be self-executing *unless* the agreement itself explicitly requires special implementing legislation, the Senate requires implementing legislation as a condition to ratification, or implementing legislation is constitutionally required. Restatement (Third) of Foreign Relations Law of the United States § 111(4) (1986). Most of the scholarly commentators agree, and make a compelling argument for finding treaties designed to protect individual rights, like Geneva III, to be self-executing.[9]

Whether Geneva III is self-executing is a question that has never been squarely confronted by any U.S. court in a case factually similar to this one. Only one court has even addressed the self-executing nature of Geneva III, and that case is not binding on this Court and is readily distinguishable from the case at bar. *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C.Cir. 1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).[10]

The government claims this Court previously found (in the June 8, 1990 Order on jurisdiction) that the Geneva Convention is not self-executing and thus does not create any individual rights that a POW could assert in court.[11] In fact, the Court did not make such a finding because the Court has never addressed the self-executing nature of Geneva III at all. Rather, in the June 8, 1990 Order the Court considered whether or not any of Geneva III's provisions would divest it of jurisdiction to try the case. "[T]he Court is not presented with the task of determining whether or not Defendants are POWs under Geneva III, but proceeds with the motion at bar *as if Defendants were entitled to the full protection afforded by the Convention*." *United States v. Noriega*, 746 F.Supp. 1506, 1525 (S.D.Fla. 1990) (emphasis added). The Court discussed the various provisions relied upon by Defendants and concluded that none of

---

breaches of the present Convention." The "grave breaches" of the Convention are defined in Article 130, and are clearly not relevant to the issue at bar.

**9.** *See, e.g.,* Restatement (Third) of Foreign Relations Law of the United States §§ 115, 701, 703 (1986); Richard B. Lillich, *Invoking International Human Rights Law in Domestic Courts*, 54 U.Cin.L.Rev. 367 (1985); Note, *Judicial Enforcement of International Law Against the Federal and State Governments*, 104 Harv.L.Rev. 1269 (1991); Jordan J. Paust, *Self–Executing Treaties*, 82 Am.J.Int'l L. 760 (1988); Stefan A. Riesenfeld, *The Doctrine of Self–Executing Treaties and U.S. v. Postal: Win at any Price?* 74 Am.J.Int'l L. 892 (1980); Andrew M. Scoble, *Enforcing the Customary International Law of Human Rights in Federal Court*, 74 Cal.L.Rev. 127 (1986); Carlos M. Vazquez, *Treaty–Based Rights and Remedies of Individuals*, 92 Colum.L.Rev. 1082 (1992).

**10.** Other cases have considered whether or not other parts of the Geneva Conventions are self-executing. *Linder v. Calero Portocarrero*, 747

F.Supp. 1452 (S.D.Fla.1990), *aff'd in part and rev'd in part,* 963 F.2d 332 (11th Cir.1992); *Handel v. Artukovic*, 601 F.Supp. 1421 (C.D.Cal. 1985).

**11.** "You found that the Geneva Convention and others like it ... were not self-executing; that is, only a signatory power can invoke the rights and privileges under the treaties to the benefit of a prisoner of war, and that indeed a prisoner of war himself had no standing to do that for himself; and your Honor denied these motions on a variety of grounds, but that was certainly one of them, that those particular treaties, including the Geneva Convention, are not self-executing, give no personal individual rights to a POW that he can assert in court." Sentencing Transcript, Jul. 10, 1992 at 19 (addressing Defendant's claim that the Geneva Convention and various other international treaties divested the Court of jurisdiction to hear the case against Noriega).

them divested the Court of jurisdiction. *Id.* at 1525–28. Thus, the Court *assumed* Geneva III applied and found that it did not prohibit the Court from hearing the criminal case against General Noriega.[12] This is a very different issue from whether or not Geneva III is self-executing, and it does not in any way foreshadow a conclusion that General Noriega cannot later invoke the Convention in a U.S. court.[13]

■ The Court discussed whether individuals have standing to invoke treaty-based rights, and acknowledged that typically they do not. *Id.* at 1533. However, it also noted that if a treaty expressly or impliedly provides a private right of action, it is self-executing and can be invoked by the individual. *Id.* at 1533 (citing *Head Money Cases*, 112 U.S. 580, 598–99, 5 S.Ct. at 253–54, 28 L.Ed. 798 (1884)).

Finally, the Court considered a number of other international treaties, and found that none were self-executing. *Id.* at 1532–35. A determination that the U.N. Charter, the O.A.S. Charter, and the Hague Convention are not self-executing does not affect whether or not Geneva III is self-executing because the self-execution issue is individual to each treaty. The language of those other agreements is of a broad and general nature and is clearly not intended to impart on an individual the right to bring a legal action to force compliance with the treaty.

■ In the case of Geneva III, however, it is inconsistent with both the language and spirit of the treaty and with our professed support of its purpose to find that the rights established therein cannot be enforced by the individual POW in a court of law. After all, the ultimate goal of Geneva III is to ensure humane treatment of POWs—not to create some amorphous, unenforceable code of honor among the signatory nations. "It must not be forgotten that the Conventions have been drawn up first and foremost to protect individuals, and not to serve State interests." *Commentary* at 23.

The Court can envision numerous situations in which the Article 78 right of protest may not adequately protect a POW who is not being afforded all of the applicable safeguards of Geneva III.[14] If in fact the United States holds Geneva III in the high regard that it claims, it must ensure that its provisions are enforceable by the POW entitled to its protections. Were this Court in a position to decide the matter, it would almost certainly find that Geneva III is self-executing and that General Noriega could invoke its provisions in a federal court action challenging the conditions of his confinement. Even if Geneva III is not self-executing, though, the United States is still obligated to honor its international commitment.

## III. CONTROLLING PROVISIONS OF GENEVA III

■ The Court's final task is to determine which provisions of Geneva III are relevant to an individual who is both a prisoner of war and a convicted felon. While these characteristics are not mutually exclusive, the combination of the two in one person creates a novel and somewhat complicated situation with respect to the application of Geneva III.

The essential dispute between Noriega and the government is whether to rely on Articles 21 and 22 or on Article 108 in determining where to place the General. The defense argues that Articles 21 and 22, which explicitly prohibit placing POWs in

---

**12.** In fact, a number of the Articles directly anticipate and permit prosecution for common crimes.

**13.** The only other mention of the Geneva Convention in the Jun. 8, 1990 opinion was a reference to the inapplicability of Common Article 3 to this case because that Article only applies to conflicts of a purely internal nature. *Noriega*, 746 F.Supp. at 1534.

**14.** To list a few examples: the Power of Origin (the POW's home state) no longer exists, is no longer recognized by the Detaining Power, or is unaware of the violations of its citizens' rights; the POW's Power of Origin has in effect "disowned" its former military personnel (as is the case here), or is unaware that POWs are even being held; the Power of Origin and/or the Protecting Power are unable to persuade the Detaining Power to meet Geneva III's requirements.

penitentiaries, apply to General Noriega. The government contends that Article 108 controls, and allows the BOP to incarcerate a POW serving a criminal sentence anywhere U.S. military personnel convicted of similar offenses could be confined, including penitentiaries.

Some concern has been expressed about the potential inconsistency between these provisions. However, a careful reading of the various Articles in their proper context proves that no inconsistency exists. Simply stated, Articles 21 and 22 do not apply to POWs convicted of common crimes against the Detaining Power. The Convention clearly sets POWs convicted of crimes apart from other prisoners of war, making special provision for them in Articles 82–108 on "penal and disciplinary sanctions."

### A. Articles 21 and 22

#### ARTICLE 21

The Detaining Power may subject prisoners of war to internment. It may impose on them the obligation of not leaving, beyond certain limits, the camp where they are interned, or if the said camp is fenced in, of not going outside its perimeter. *Subject to the provisions of the present Convention relative to penal and disciplinary sanctions, prisoners of war may not be held in close confinement except where necessary to safeguard their health* and then only during the continuation of the circumstances which make such confinement necessary. (emphasis added)

#### ARTICLE 22

Prisoners of war may be interned only in premises located on land and affording every guarantee of hygiene and healthfulness. *Except in particular cases which are justified by the interest of the prisoners themselves, they shall not be interned in penitentiaries.* (emphasis added)

Articles 21 and 22 appear at the beginning of Chapter I—"General Observations"—of Section II—"Internment of Prisoners of War." This chapter of Geneva III deals with the internment of POWs who have not been convicted of crimes, and is thus inapplicable to General Noriega. Defendant's reliance on these Articles is misplaced; if anything, they make clear that POWs convicted of crimes are subject to a different set of rules than other prisoners of war. Article 22's general prohibition against internment of POWs in penitentiaries is limited by Article 21's acknowledgement that all general requirements regarding the treatment of POWs are "subject to the provisions of the present Convention relative to penal and disciplinary sanctions." This reference to Articles 82–108 shows that the Articles in Section II, Chapter I do *not* apply to POWs serving judicial sentences.

Further support for this argument is the use of the term "internment" throughout Section II, Chapter I, as opposed to the terms "detention," "confinement," or "imprisonment" used in the penal sanctions Articles. The Commentary elaborates on this point:

> The concept of internment should not be confused with that of detention. Internment involves the obligation not to leave the town, village, or piece of land, whether or not fenced in, on which the camp installations are situated, but it does not necessarily mean that a prisoner of war may be confined to a cell or room. *Such confinement may only be imposed in execution of penal or disciplinary sanctions, for which express provision is made in Section VI, Chapter III.*

*Commentary* at 178 (emphasis added). Thus, Article 22 prohibits *internment*—but not *imprisonment*—of POWs in penitentiaries.

For these reasons, it is the opinion of this Court that Articles 21 and 22 do not apply to General Noriega.

### B. Article 108

The government has argued that the Geneva Convention "explicitly and unambiguously" authorizes the BOP to incarcerate Noriega in a penitentiary, so long as he is not treated more harshly than would be a

member of the U.S. armed forces convicted of a similar offense.

 Pursuant to 18 U.S.C. § 3231, federal district courts have concurrent jurisdiction with military courts over all violations of the laws of the United States committed by military personnel. *Noriega*, 746 F.Supp. at 1525. Ten U.S.C. § 814 and 32 CFR § 503.2(a) instruct the military authorities to deliver the alleged offender to the civil authorities for trial just like any other individual accused of a crime. Once that individual is convicted and sentenced by a civil court, he or she is also incarcerated in a civil facility, including a federal penitentiary, just like any other convicted criminal.

Paragraph one of Article 108 reads:

Sentences announced on prisoners of war after a conviction has become duly enforceable, shall be served in the same establishments and under the same conditions as in the case of members of the armed forces of the Detaining Power. These conditions shall in all cases conform to the requirements of health and humanity.

Pursuant, then, to paragraph one it appears that General Noriega could technically be incarcerated in a federal penitentiary without violating the Geneva Convention. However, this should not be the end of the inquiry. The real issue is whether federal penitentiaries in general or any particular federal penitentiary can afford a prisoner of war the various protections due him under the Geneva Convention.[15]

Article 108 requires that the conditions in any facility in which a POW serves his sentence "shall in all cases conform to the

requirements of health and humanity." Interpreting the language of these provisions is not always easy. The Commentary to Article 108 says reference should be made to Articles 25 and 29,[16] which lay down minimum standards of accommodation for POWs. *Commentary* at 502.

 In addition, Article 108 dictates that the POW must be allowed to "receive and despatch [sic—British spelling] correspondence, to receive at least one relief parcel monthly, to take regular exercise in the open air, to have the medical care required by [his] state of health, and the spiritual assistance [he] may desire." Many of these terms are vague. For example, what is "regular" exercise? Reasonable people may differ on what these provisions require. However, given the United States' asserted commitment to protecting POWs and promoting respect for the laws of armed conflict through liberal interpretation of the Geneva Conventions, vague or ambiguous terms should always be construed in the light most favorable to the prisoner of war.

## C. Other Applicable Articles

Paragraph three of Article 108 states:

In any case, prisoners of war sentenced to a penalty depriving them of their liberty shall retain the benefit of the provisions of Articles 78 and 126 of the present Convention.... Penalties to which they may be subjected shall be in accordance with the provisions of Article 87, third paragraph.

The government concedes that the three Articles cited within the text of Article

---

**15.** The government has argued that because all federal penal facilities must satisfy the Eighth Amendment prohibition on cruel and unusual punishment, any facility is at least theoretically "humane." This misses the point, however, that the Geneva III standard of humane treatment is not the same as the Constitutional standard embodied in the Eighth Amendment. The Eighth Amendment establishes a minimum level of treatment. As long as the BOP meets that minimum standard, it can operate within the confines of the Eighth Amendment. The Geneva Convention, on the other hand, delineates some fairly specific benefits for POWs which may not always be required by the Eighth Amendment.

**16.** Article 25 provides, in relevant part:

[C]onditions shall make allowance for the habits and customs of the prisoners and shall in no case be prejudicial to their health.

The premises ... shall be entirely protected from dampness and adequately heated and lighted.

Article 29 provides, in relevant part:

Prisoners of war shall have for their use, day and night, conveniences which conform to the rules of hygiene and are maintained in a constant state of cleanliness.

108—78,[17] 87, and 126—also apply to General Noriega. Gov't Resp. to Def.Post–Hearing Memo. of Law, Sept. 29, 1992 at 4 ("Defendant correctly contends that a sentenced prisoner of war retains prisoner of war status for purposes of correspondence, health and spiritual care, and exercise").

Paragraph three of Article 87 prohibits collective punishment for individual acts, corporal punishment, imprisonment in premises without daylight and, in general, any form of torture or cruelty. Again, some of these terms are vague, but because of the U.S. commitment to construing the Geneva Conventions liberally, and because it is imperative that the United States set a good example in its treatment of POWs, ambiguous terms must be construed in the light most favorable to the POW.

Article 126 creates an almost unrestricted grant of authority for representatives of the Protecting Power and international humanitarian organizations to supervise the treatment of POWs wherever and in whatever type of facility they may be held.

The government argues that Article 108's reference to Articles 78, 87, and 126 is an express limitation on Noriega's rights—that these are the *only* Articles that apply to POWs incarcerated for common crimes. Defendant counters that 108 is just a floor, so while POWs may not be treated worse than U.S. soldiers convicted of similar crimes, frequently they must be treated better. Noriega asserts that Article 108 must be read in conjunction with Article 85 which states that "[p]risoners of war prosecuted under the laws of the Detaining Power for acts committed prior to capture shall retain, *even if convicted,* the benefits of the present Convention" (emphasis added).[18]

▆▆▆ The Commentary supports Noriega's position that he continues to be entitled to the Convention's general protections:

[T]he Convention affords important safeguards to prisoners of war confined following a judicial sentence. Some of these safeguards result from general provisions applicable to all the conditions relating to internment, such as Article 13 (humane treatment), Article 14 (respect for the person of prisoners ...), Article 16 (equality of treatment). Other provisions refer expressly to the execution of penalties and specifically prohibit cruelty, any attack on a prisoner's honour (Article 87), and discriminatory treatment (Article 88).... [C]onfinement does not involve any suppression of the principal safeguards afforded to prisoners of war by the present Convention, and the number of provisions rendered inapplicable by the fact of ... confinement is therefore small.... In fact, these articles [78, 87, 126] are *among the provisions* which are not rendered inapplicable by confinement. *Because of their greater importance, however, ... special reference was made to them.*

*Commentary* at 501–03 (emphasis added). It thus appears that a convicted POW is entitled to the basic protections of Geneva III for as long as he remains in the custody of the Detaining Power. Throughout the Commentary to Article 108, reference is made to Articles other than the three specifically named in the text. *Commentary* at 500–08. The logical conclusion is that judicial confinement serves to abrogate only those protections fundamentally inconsistent with incarceration.

This Court finds that, at a minimum, all of the Articles contained in Section I, General Provisions, should apply to General Noriega, as well as any provisions relating to health. By their own terms, Articles 82–88 (the General Provisions section of the Penal and Disciplinary Sanctions chapter) and 99–108 (Judicial Proceedings subsection) apply.

In addition, the Court would once again note that the stated U.S. policy is to err to the benefit of the POW. In order to set

**17.** Article 78 is discussed *supra* at § II.C(1).

**18.** This does not really help Defendant's argument, however, because "the benefits of the present Convention" could still be limited to Articles 78, 87, 108, and 126, as the government contends.

the proper example and avoid diminishing the trust and respect of other nations, the U.S. government must honor its policy by placing General Noriega in a facility that can provide the full panoply of protections to which he is entitled under the Convention.

## IV. CONCLUSION

Considerable space has been taken to set forth conclusions which could have been stated in one or two pages. That is because of the potential importance of the question to so many and the precedentially uncharted course it spawned. The Defendant Noriega is plainly a prisoner of war under the Geneva Convention III. He is, and will be, entitled to the full range of rights under the treaty, which has been incorporated into U.S. law. Nonetheless, he can serve his sentence in a civilian prison to be designated by the Attorney General or the Bureau of Prisons (this is a pre-guidelines case) so long as he is afforded the full benefits of the Convention.

Whether or not those rights can be fully provided in a maximum security penitentiary setting is open to serious question. For the time being, however, that question must be answered by those who will determine Defendant's place and type of confinement. In this determination, those charged with that responsibility must keep in mind the importance to our own troops of faithful and, indeed, liberal adherence to the mandates of Geneva III. Regardless of how the government views the Defendant as a person, the implications of a failure to adhere to the Convention are too great to justify departures.

In the turbulent course of international events—the violence, deceit, and tragedies which capture the news, the relatively obscure issues in this case may seem unimportant. They are not. The implications of a less-than-strict adherence to Geneva III are serious and must temper any consideration of the questions presented.

DONE and ORDERED.