# SUPREME COURT OF THE UNITED STATES

## MANUEL ANTONIO NORIEGA *v.* GEORGE PASTRANA, WARDEN

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 09–35.   Decided January 25, 2010

The petition for a writ of certiorari is denied.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting from denial of certiorari.

"[I]n our tripartite system of government," it is the duty of this Court to "say 'what the law is.'" *Boumediene* v. *Bush*, 553 U. S. \_\_\_ (2008) (slip op., at 36) (quoting *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803)). This duty is particularly compelling in cases that present an opportunity to decide the constitutionality or enforceability of federal statutes in a manner "insulated from the pressures of the moment," and in time to guide courts and the political branches in resolving difficult questions concerning the proper "exercise of governmental power." *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 637 (2006) (KENNEDY, J., concurring in part); see generally *Sanchez-Llamas* v. *Oregon*, 548 U. S. 331, 353–354 (2006); *Hamdan*, *supra*, at 588 (quoting *Ex parte Quirin*, 317 U. S. 1, 19 (1942)). This is such a case.

The questions presented are, in the Solicitor General's words: "1. Whether Section 5 of the Military Commissions Act of 2006, Pub. L. No. 109–366, 120 Stat. 2631, precludes petitioner from invoking the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, as a source of rights in a habeas corpus proceeding"; and "2. Whether, assuming petitioner can assert a claim based on the Geneva Convention, his extradition to France would violate the Convention." Brief in Opposition i (some

citations omitted).[1]  Answering just the first of these questions would provide much-needed guidance on two important issues with which the political branches and federal courts have struggled since we decided *Boumediene.*  The first is the extent, if any, to which provisions like Section 5 affect 28 U. S. C. §2241 in a manner that implicates the constitutional guarantee of habeas corpus.  The second is whether the Geneva Conventions are self-executing and judicially enforceable.

It is incumbent upon us to provide what guidance we can on these issues now.  Whatever conclusion we reach, our opinion will help the political branches and the courts discharge their responsibilities over detainee cases, and will spare detainees and the Government years of unnecessary litigation.  These considerations alone justify review.  That petitioner was convicted in federal court (rather than in a military commission) in criminal proceedings uncomplicated by classified information or issues relating to extraterritorial detention is an additional reason to grant certiorari.  It is our duty to say what the law is on important matters within our jurisdiction.  That is what we should do.

I

Petitioner General Manuel Noriega is the former head of the Panamanian Defense Forces.  In 1988, a federal grand jury indicted Noriega, and the U. S. military thereafter brought him to Florida.  A federal jury convicted him of various federal narcotics-related offenses, and the District Court sentenced him to a 30-year prison term.  In response to Noriega's concerns about the type of care he

---

[1] We routinely grant certiorari on questions the Solicitor General presents in a brief in opposition, see, *e.g.*, *Weyhrauch* v. *United States*, 557 U. S. __ (2009), or in an *amicus* brief, see, *e.g.*, *Hamilton* v. *Lanning*, *ante*, p. ___; *Republic of Philippines* v. *Pimental*, 552 U. S 1061 (2007).

would receive in the custody of the Bureau of Prisons, the District Court designated Noriega a prisoner of war (POW) entitled to the protections of the Geneva Conventions. See *United States* v. *Noriega*, 808 F. Supp. 791 (SD Fla., 1992).[2] Noriega's conviction and sentence were affirmed in proceedings not relevant here. See *United States* v. *Noriega*, 117 F. 3d 1206 (CA11 1997), cert. denied, 523 U. S. 1060 (1998).

In July 2007, two months before Noriega was scheduled to be released on parole, he filed a habeas corpus petition under 28 U. S. C. §2255. Relying on the District Court's POW designation, Noriega alleged that the United States violated the Geneva Conventions when it acquiesced in the French Government's request to extradite him to France so he could face criminal charges there upon his release from U. S. custody. See *United States* v. *Noriega*, No. 88–0079–CR, 2007 WL 2947572 (SD Fla., Aug. 24, 2007). The District Court agreed with Noriega that his

———————

[2] Citing International Red Cross and academic commentary in support of its "belie[f] [that the Third] Geneva [Convention] is self-executing and provides General Noriega with a right of action in a U. S. court for violation of its provisions," the District Court addressed Noriega's status under the treaty. *United States* v. *Noriega*, 808 F. Supp., at 794. The District Judge found that the hostilities in Panama constituted an "'armed conflict'" within the meaning of Article 2 of the Third Geneva Convention, that Noriega was a member of the armed forces of a party to the conflict under Article 4 of the Third Convention, and that the District Court was a "'competent tribunal'" to determine Noriega's POW status under Article 5 of the Third Convention. See *id.*, at 793–796. Accordingly, the court concluded that, notwithstanding various separation-of-powers and justiciability concerns, "Noriega is in fact a prisoner of war as defined by Geneva III, and as such must be afforded the protections established by the treaty" while in federal custody. *Id.*, at 796. The court then identified Convention rights that it believed would govern Noriega's confinement, see *id.*, at 799–803, and observed that "[w]hether or not those rights can be fully provided in a maximum security penitentiary setting is open to serious question," *id.*, at 803.

POW status entitled him to the Conventions' protection until his "final release and repatriation," but dismissed his §2255 petition on the ground that his extradition challenge was not directed to "any defect in [his] sentence," and thus was not cognizable under §2255. *Id.*, at *1 (internal quotation marks and citation omitted). Noriega then filed the same claims under 28 U. S. C. §2241, and the District Court ultimately[3] stayed his extradition pending appeal on the ground that his challenge rested on "credible arguments . . ., particularly with regard to the interpretation of certain provisions of the Geneva Convention[s]," on which "no other federal court has ruled." No. 07−CV−22816−PCH, 2008 WL 331394, *3 (SD Fla., Jan. 31, 2008).

On appeal, Noriega argued that his extradition to France would violate several provisions of the Third Convention and that the District Court erred in concluding otherwise. In response, the Government asserted that the court lacked jurisdiction over Noriega's claims because §5(a) of the Military Commissions Act of 2006 (MCA) establishes that "[t]he Geneva Conventions are not self-executing" or judicially enforceable in habeas corpus actions. Brief for United States in No. 08–11021–F (CA11), p. 13 (hereinafter Brief for United States).[4] MCA §5(a) provides:

—————

[3] The District Court dismissed Noriega's initial §2241 petition because the court concluded that it lacked jurisdiction to consider the petition's extradition challenge in Noriega's criminal case as opposed to a separate action challenging his certificate of extraditability. See *United States* v. *Noriega*, No. 88−0079−CR, 2007 WL 2947981, *1 (SD Fla., Sept. 7, 2007) (dismissing the petition without prejudice but reiterating the merits concerns with Noriega's Geneva Convention claims that the court articulated in dicta in dismissing his §2255 petition).

[4] The Government also challenged Noriega's claims as meritless and outside the scope of habeas review under Circuit precedent.

THOMAS, J., dissenting

> "No person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or a current or former officer, employee, member of the Armed Forces, or other agent of the United States is a party as a source of rights in any court of the United States or its States or territories. 120 Stat. 2631, note following 28 U. S. C. §2241."[5]

Emphasizing that a non-self-executing treaty "'addresses itself to the political, not the judicial department,'" the Government observed that "no court of appeals has held that the provisions of the Geneva Conventions are judicially enforceable in any context." Brief for United States 13 (quoting *Medellín* v. *Texas*, 552 U. S. 491, 516 (2008)). The Government then argued that "confirmation of this [view] can be found in the enactment of [MCA §5(a)], which "codifie[d] the principle that the Geneva Conventions [a]re not judicially enforceable by private parties," but did so in a narrow way that does not purport to strip courts of habeas jurisdiction, and thus does "not implicate" the Suspension Clause analysis in *Boumediene*. Brief for United States 14, n. 6.[6]

---

[5] Recent amendments to the Military Commissions Act of 2006, collectively titled the Military Commissions Act of 2009, see National Defense Authorization Act for Fiscal Year 2010, see §§1801–1807, 123 Stat. 2574–2614, do not affect MCA §5(a). The 2009 amendments principally update provisions relevant to the Guantanamo habeas corpus cases pending in the U.S. District Court for the District of Columbia and clarify the due process protections available in those and other noncitizen detainee cases to which the constitutional and treaty issues in this case relate. See *ibid.*; see also J. Elsea, CRS Report for Congress, Comparison of Rights in Military Commission Trials and Trials in Federal Criminal Court, 2–4 (Nov. 19, 2009).

[6] Although the Government distinguishes MCA §5(a) from the jurisdiction-stripping provision the Court invalidated in *Boumediene*, it stops short of asserting that §5(a) is constitutional. See Brief in Opposition 8, n.

The Eleventh Circuit accepted the District Court's designation of Noriega as a POW, but agreed with the Government's interpretation of MCA §5(a):

> "We affirm and hold that §5 of the Military Commissions Act of 2006 precludes Noriega from invoking the Geneva Convention as a source of rights in a habeas proceeding and therefore deny Noriega's habeas petition.

> .          .          .          .          .

> "The issues present in *Boumediene* v. *Bush* concerning the constitutionality of §7 of the MCA, are not presented by §5 . . . . In *Boumediene*, the Supreme Court found §7 of the MCA, which explicitly removed the jurisdiction of courts to consider habeas actions by enemy combatants, to be unconstitutional . . . . Section 5, in contrast, as discussed more fully, *infra*, at most changes one substantive provision of law upon which a party might rely in seeking habeas relief. We are [thus] not presented with a situation in which potential petitioners are effectively banned from seeking habeas relief because any constitutional rights or claims are made unavailable. 564 F. 3d 1290, 1292, 1294 (CA11 2009) (citations and parenthetical omitted)."[7]

Noriega's petition challenges both the Eleventh Circuit's interpretation of MCA §5(a) and the provision's constitutionality. Noriega begins by asserting that the Court of Appeals erred in holding "that [MCA §5(a)] absolutely and unambiguously prohibits persons from raising any claim based upon the four Geneva Conventions" in a habeas

---

[7] The Court of Appeals also concluded that, "assuming *arguendo*" Noriega is correct that "§5 of the MCA does not preclude [his] claim," *Noriega*, 564 F. 3d, at 1297, the Third Geneva Convention does not bar his extradition to France and the "United States has fully complied with" the treaty, *id.*, at 1298.

corpus action. Pet. for Cert. 10; see also *id.*, at 12 ("At best, the statutory scheme is ambiguous"). Noriega next asserts that, if the Eleventh Circuit's interpretation of §5(a) is correct, the provision violates the Supremacy Clause, see *id.*, at 11−12, and the Suspension Clause, see Reply to Brief in Opposition 2. Noriega's Supremacy Clause argument is that, to the extent MCA §5(a) governs his Geneva Convention claims, the provision impermissibly effects a "complete repudiation" of the treaty. Pet. for Cert. 11. The Government responds that this argument suffers from two fatal flaws. First, this Court has held that a treaty, which is "'primarily a compact between independent nations,'" remains in force as the supreme law of the land even where its enforcement is left to "international negotiations" rather than "domestic courts." Brief in Opposition 7 (quoting *Head Money Cases*, 112 U. S. 580, 598 (1884)); see *Medellín*, *supra*, at 505, and n. 3. Second, "[w]hatever the domestic effect of the Third Geneva Convention before the enactment of the MCA," this Court has held that 'it is within Congress' power to change domestic law, even if the law originally arose from a self-executing treaty.'" Brief in Opposition 7 (quoting *Noriega*, *supra*, at 1295–1296); see also *Medellín*, *supra*, at 509, n. 5. Accordingly, the Government agrees with the Eleventh Circuit that MCA §5(a) "does not change the international obligations of the United States under the Geneva Conventions," but does "supersed[e] whatever domestic effect the Geneva Conventions may have had in actions such as this." Brief in Opposition 7–8 (internal quotation marks and citation omitted). That brings Noriega to his Suspension Clause argument. He replies that, if MCA §5(a) operates in the manner the Government describes and the Eleventh Circuit held, the provision is unconstitutional under *Boumediene* because it "effectively works a suspension of the writ." Reply to Brief in Opposition 2 (asserting that "to divorce the writ from

the law is to destroy the writ").

## II

As the Eleventh Circuit's opinion makes clear, the threshold question in this case is whether MCA §5(a) is valid. Answering that question this Term would provide courts and the political branches with much needed guidance on issues we left open in *Boumediene*. See *Boumediene*, 553 U. S, at ___, ___ (slip op. at 64−66, 68−70). Providing that guidance in this case would allow us to say what the law is without the unnecessary delay and other complications that could burden a decision on these questions in Guantanamo or other detainee litigation arising out of the conflict with Al Qaeda.

*Boumediene* invalidated MCA §7's attempt to strip federal courts of habeas jurisdiction over claims by a specified class of non-citizen detainees ("unlawful enemy combatants"), but did not determine the "content of the law that governs petitioners' detention," *id.*, at ___ (slip op. at 69), or the extent to which §2241's substantive provisions affect the constitutional "procedural protections of habeas corpus," *id.*, at ___ (slip op. at 70). Section 2241 broadly confers jurisdiction over a habeas corpus action by any person who claims to be held "in custody in violation of the Constitution or laws or treaties of the United States." See *Rasul* v. *Bush*, 542 U. S. 466, 473 (2004). MCA §5(a) eliminates the Geneva Conventions as a source of rights upon which §2241 petitioners may rely in challenging their detentions. Statutory amendments to an existing law ordinarily involve nothing more than a valid exercise of Congress' Article I authority. See, *e.g.*, *Chew Heong* v. *United States*, 112 U. S. 536, 562–563 (1884). Noriega asserts that the difference in this case is that the statutory amendment narrows the scope of §2241. Assuming that is correct, the indeterminate interplay between the constitutional and statutory guarantees of habeas

corpus under our precedents permits Noriega to argue that the manner in which MCA §5(a) affects §2241 proceedings implicates the Suspension Clause. Only we can determine whether the Eleventh Circuit correctly rejected that argument.

The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U. S. Const., Art. I, §9, cl. 2. Because the Clause addresses only the suspension—not the content or existence—of the "Privilege of the Writ," *ibid.*, we have long recognized the "obligation" the first Congress "must have felt" to "provid[e] efficient means by which this great constitutional privilege should receive life and activity." *Ex parte Bollman*, 4 Cranch 75, 95 (1807). But we have also steadfastly declined to adopt a date of reference by which the writ's constitutional content, if any, is to be judged, see *Boumediene*, *supra*, ___ (slip op. at 15−17), and thus have left open the question whether statutory efforts to limit §2241 implicate the Suspension Clause, see, *e.g.*, *INS* v. *St. Cyr*, 533 U. S. 289, 300–301 (2001). This question, which has already divided the Court in other contexts, *see ibid.*,[8] is clearly presented here. Noriega asserts

─────────

[8] Compare *St. Cyr*, 533 U. S., at 300–301 (2001) (declining to identify a specific date of reference for judging the constitutional scope of the writ, but concluding that the Court nonetheless should construe the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) to allow §2241 jurisdiction over certain habeas petitions because doing so would avoid the Suspension Clause question that otherwise would arise), with *id.*, at 335–341 (SCALIA, J., dissenting) (emphasizing that, although IIRIRA displaces §2241 jurisdiction unambiguously and thus renders the canon of constitutional avoidance inapplicable, there is no constitutional question to avoid, because the Suspension Clause is addressed only to suspension (*i.e.*, temporary withholding of the operation) of the writ on the terms authorized by the habeas corpus statute, not to Congress' power to alter the substance of the habeas rights the statute confers) and *id.*, at 340−341, n. 5 ("If, as

that MCA §5(a) is unconstitutional because it "effectively works a suspension of the writ" by imposing the same type of statutory limitation the Court addressed in *St. Cyr*. Reply to Brief in Opposition 2 (implicitly equating the constitutional scope of the writ with §2241's grant of habeas corpus jurisdiction over individuals allegedly "held in violation of the Constitution, laws, or treaties of the United States"). The Eleventh Circuit, however, saw no constitutional problem with the statute and upheld it as valid and distinguishable from the provision deemed unconstitutional in *Boumediene.* See 564 F. 3d, at 1294.

Addressing Noriega's challenge to the Eleventh Circuit's decision would resolve the important statutory and constitutional questions here and would guide courts and the political branches in addressing the same and similar issues in other detainee cases. See, e.g., *Al-Bihani*, *supra*, at *5 ("The Supreme Court has provided scant guidance on these questions, consciously leaving the contours of the substantive and procedural law of detention open for lower courts to shape in a common law fashion."). Recent court decisions, as well as recent Executive Branch court filings and policy determinations, specifically invoke the Geneva Conventions as part of the law that governs detainee treatment in the United States and abroad. For example, in September 2009, the U.S. District Court for the District of Columbia issued a redacted version of a classified memorandum opinion in which it granted habeas corpus relief in the oldest of the pending Guantanamo cases because the petitioner's indefinite detention was based "almost exclusively" on unreliable "confessions" obtained "using abusive techniques that violated the Army Field

—————

the Court concedes, the writ could not be suspended within the meaning of the Suspension Clause until Congress affirmatively provided for habeas by statute, then surely Congress may subsequently alter what it had initially provided for, lest the Clause become a one-way ratchet." (internal quotation marks and citations omitted)).

Manual and the 1949 Geneva Convention Relative to the Treatment of Prisoners of War." *Al Rabiah* v. *United States,* Civ. Action No. 02–828, Unclassified Mem. Op. (DC Sept. 17, 2009), pp. 1–2, 43.

Several recent D. C. Circuit decisions, one of which is now pending before us, similarly implicate the importance of the Geneva Convention and MCA §5(a) questions in this case. In *Kiyemba* v. *Obama*, 555 F. 3d 1022 (2009) *(Kiyemba I)*, cert. granted, *ante*, p. ___, the petitioners, Guantanamo detainees who prevailed on their habeas corpus claims in federal court but cannot return to their home country, rely on the Geneva Conventions in claiming a right to be released in the territorial United States, see Pet. for Cert. in No. 08–1234, pp. i, 34. Although the D. C. Circuit did not address MCA §5(a) in rejecting this claim, the Government contends before this Court that MCA §5(a) bars petitioners' reliance on the Conventions, see Brief in Opposition in No. 08-1234, pp. 23–24, and Judge Rogers' opinion concurring in the D. C. Circuit's judgment relies upon the same repatriation language in Article 118 of the Third Convention that Noriega raises here, see 555 F. 3d, at 1033, n. 2. In *Al-Bihani*, *supra*, the D. C. Circuit directly invokes MCA §5(a) in rejecting a Guantanamo detainee's claim that he was entitled to habeas corpus relief because his detention violated, *inter alia*, the Third Geneva Convention, see *id.*, at \*2–3; \*6 (stating that MCA §5(a), "a provision not altered by the MCA of 2009, explicitly precludes detainees from claiming the Geneva Conventions—which include criteria to determine who is entitled to P.O.W. status—as a source of rights"). Finally, the D. C. Circuit's decision in *Kiyemba* v. *Obama*, 561 F. 3d 509 (2009) *(Kiyemba II)*, implicates the issues here in holding, contrary to several recent district court decisions,[9] that another MCA provision (MCA §7(a)(2), codified

─────────

[9] See *Khadr* v. *Bush*, 587 F. Supp. 2d 225, 235 (DC 2008) (Bates, J.);

at 28 U. S. C. §2241(e)(2)), does not deprive federal habeas corpus courts of jurisdiction to consider claims in which certain classes of detainees challenge their conditions of confinement under the Geneva Conventions. See 561 F. 3d, at 512–513.

The extent to which noncitizen detainees may rely on the Geneva Conventions as a source of rights against the United States has also been the subject of increasing debate in the political branches. Recent Executive Branch Orders and court filings cite the Conventions in articulating the legal standards that govern detainee treatment. See, *e.g.*, Exec. Order No. 13491, §3, 74 Fed. Reg. 4894 (2009) (making "Common Article 3 standards" the "minimum baseline" for the treatment of any individual who, in the course of "any armed conflict," comes into the "custody or under the effective control of an officer, employee, or other agent of the United States" or is "detained within a facility owned, operated, or controlled by a department or agency of the United States"); Brief for United States in Misc. No. 08–442 (TFH), p. 1 (Mar. 13, 2009) (apprising the court of the Government's decision to treat detainees formerly designated as "unlawful enemy combatants" under new standards that draw on the "laws of war," as those laws have "developed over time and have periodically been codified in treaties such as the Geneva Conventions").[10] Congress, in turn, is considering new legislation

––––––––

*In re Guantanamo Bay Detainee Litigation*, 577 F. Supp. 2d 312, 314 (DC 2008) (Hogan, J.); *In re Guantanamo Bay Detainee Litigation*, 570 F. Supp. 2d 13, 18 (DC 2008) (Urbina, J.).

[10] This standard presumably will control the Government's position in habeas corpus actions that arise in other circuits pursuant to the President's recent decision to prosecute or imprison (or both) certain Guantanamo detainees in New York and Illinois. See Hearings Before the Senate Committee on the Judiciary, Testimony of Attorney General Eric Holder pp. 8–9 (Nov. 18, 2009); Federal News Service, Remarks by Former Attorney General Michael Mukasey (Nov. 13, 2009); Presidential Memorandum, Closure of Detention Facilities at the Guantanamo

that would further clarify the extent to which detainees can enforce Geneva Convention obligations against the United States in federal courts, but progress on these proposals has been complicated by uncertainty over the statutory and constitutional questions in this case.[11]

As noted, addressing these questions now,[12] if only the statutory issues, would avoid years of litigation and uncertainty no matter what we conclude on the merits. A decision upholding MCA §5(a) would obviate the need for detainees, the Government, and federal courts to struggle

_____

Bay Naval Base (Dec. 15, 2009); Some Guantanamo Detainees to Move to Illinois Prison, Am. Forces Press Serv. (Dec. 15, 2009); Letter to Pat Quirin, Governor of Illinois, from the Attorney General, the Secretaries of State, Defense, and Homeland Security, and the Director of National Intelligence, at 2 (Dec. 15, 2009) (all sources available in Clerk of Court's case file).

[11] See, *e.g.*, J. Elsea, K. Thomas, & M. Garcia, CRS Report for Congress, Enemy Combatant Detainees: Habeas Corpus Challenges in Federal Court, 36, 41-43 (2009).

[12] Because the D. C. Circuit's majority opinion in *Kiyemba I* does not address MCA §5(a), the provision's validity is not squarely presented in that case. See *Kiyemba* v. *Obama*, 555 F. 3d 1022 (CADC 2009) *(Kiyemba I)*, cert. granted, *ante*, p. ___ (2009). And granting review of the D. C. Circuit's decision in *Al-Bihani*, which does address MCA §5(a), would not guarantee a decision on the statute's validity. See *Al-Bihani* v. *Obama*, No. 09−5051, 2010 WL 10411 (CADC 2010). *Al-Bihani* addresses MCA §5(a) in rejecting only one of many claims for habeas corpus relief, so it is not clear that the Court would need to address the statute's validity in deciding the case. And even if the Court were to address §5(a), the decision would come next Term, thus providing no guidance to courts that must adjudicate pending habeas corpus actions this spring and summer. In contrast, addressing MCA §5(a)'s validity in this case would timely provide such guidance. Doing so could also aid our disposition of *Kiyemba I* because answering the questions presented here could clarify the constitutional scope of the writ of habeas corpus in a manner that could affect the *Kiyemba I* petitioners' argument about the inherent remedial power of habeas corpus courts. See Pet. for Cert. in No. 08–1234, pp. 14–16, 22–23; see generally *Kiyemba I*, 555 F. 3d, at 1026–1027; *St. Cyr*, 533 U. S., at 335–340 (SCALIA, J., dissenting).

(as they did here) with Geneva Convention claims in habeas corpus proceedings.[13] And, it would give the political branches a clearer sense of the constitutional limits to which new legislative or policy initiatives must adhere. The latter benefit would also follow if we were to invalidate MCA §5(a). In addition, such a ruling could well allow us to reach the question we left open in *Hamdan*— whether the Geneva Conventions are self-executing and judicially enforceable—because this case is not governed by the Uniform Code of Military Justice provisions on which the *Hamdan* majority relied in holding Common Article III applicable to the proceedings in that case. See *Hamdan*, 548 U. S., at 627–628; see also *id.*, at 637, 642–643 (KENNEDY, J., concurring in part). Finally, if the Court were to conclude that the Conventions are self-executing and judicially enforceable in habeas corpus proceedings, this case would present two additional questions relevant to noncitizen detainee litigation: whether federal courts may classify such detainees as POWs under the Third Convention, and whether any of the Conventions requires the United States immediately to repatriate detainees entitled to release from U. S. custody.[14]

Against these considerations, the Government provides no compelling reason to decline review.[15] Accord-

---

[13] MCA §5(a) applies not only to individuals who, like Noriega, have (rightly or not) been designated POWs, but also to "any person" who invokes the Conventions as a source of rights in any "habeas or other civil action" to which the United States is a party, see 120 Stat. 2631, note following 28 U. S. C. §2241.

[14] Both questions are subsumed in the second question in the Solicitor General's brief: "[w]hether, assuming petitioner can assert a claim based on the Geneva Convention, his extradition to France would violate the Convention." Brief in Opposition i.

[15] The Solicitor General's principal ground for opposing certiorari is that the Eleventh Circuit's decision does not conflict with the decision of any other Circuit. See Brief in Opposition 6. That is true but not surprising. The original version of the MCA is only three years old and,

ingly, I would take the case and decide the questions presented in the Solicitor General's brief.[16]

—————

as the Solicitor General is careful to note, Noriega is "the only person *currently* detained by the United States as a prisoner of war." *Ibid.* (emphasis added). Accordingly, the lack of a circuit split on the question whether MCA §5(a) bars POWs in federal custody in the United States from invoking the Geneva Conventions in habeas proceedings does not negate the compelling reasons to grant review. Indeed, the Court has taken cases in this area without the benefit of any opinion from a court of appeals, see *Ex parte Quirin*, *supra*, and in splitless cases involving rare facts and ongoing diplomatic negotiations, see *Kiyemba I*, *ante*, p. \_\_\_. The Court has also granted review of separation-of-powers and other important legal questions on records far less developed than that here, see, *e.g.*, *Robertson* v. *United States ex rel. Watson*, *ante*, p. \_\_\_; *Christian Legal Soc. Chapter of Univ. of Cal. Hasting College of Law* v. *Martinez*, *ante*, p. \_\_\_; on petitions that have required us to reformulate the questions presented, see, *e.g.*, *Robertson*, *supra*; *Reed Elsevier, Inc.* v. *Muchnick*, 555 U. S. \_\_\_ (2009); and even on petitions we initially denied, see *Boumediene* v. *Bush*, 551 U. S. 1160 (2007). The Solicitor General also claims (again based on the fact that Noriega is "currently" the only POW in U. S. custody) that review is not warranted because the Eleventh Circuit's decision is of "limited ongoing significance." *Ibid.* This assertion is not persuasive for the reasons set forth above.

   [16] As noted, the Solicitor General's first question presented is whether MCA §5(a) "precludes petitioner from invoking" the Third Geneva Convention "as a source of rights in a habeas corpus proceeding." Brief in Opposition i. Such statutory questions do not automatically, or even typically, require a court to consider the statute's constitutionality. Here, however, Noriega has consistently argued that, if the statute precludes him from invoking the Geneva Conventions in the manner the Solicitor General's question describes and the Eleventh Circuit held, the statute would violate the Suspension Clause. See *supra*, at 6–7. Thus, the Suspension Clause issue may in this case fairly be viewed as implicit in the statutory question presented.