KING, Circuit Judge, dissenting:
 

 Whether Irek Hamidullin qualifies as a prisoner of war (a "POW") under the Third Geneva Convention implicates two difficult questions with great potential repercussions for international relations and the safety and security of our military personnel abroad: (1) whether the war in Afghanistan against the Taliban was an international armed conflict within the meaning of the Third Convention's Article 2 when Hamidullin was captured by the U.S. Army in late 2009; and (2) whether Hamidullin satisfies one of the categories of POWs articulated in the Convention's Article 4. Hamidullin and the Government mutually left those questions to be answered by the district court-simply presenting evidence and argument in support of their respective theories-without asserting that either issue had already been conclusively determined by the Executive Branch and without contesting the district court's authority to decide the issues in the first instance. Thereafter, the district court opted to avoid the Article 2 question (recognizing that it "may elude a definitive answer"), proceeded to its own Article 4 analysis, and concluded that Hamidullin is not eligible for POW status.
 
 See
 

 United States v. Hamidullin
 
 ,
 
 114 F.Supp.3d 365
 
 , 387 (E.D. Va. 2015).
 

 Only later, after we raised concerns in this appeal about whether the Third Convention questions are initially for the Executive or the Judiciary, did the parties change stances on the district court's power to dispose of Hamidullin's POW claim. Hamidullin has since been firm that the Article 2 international armed conflict question is for the courts, but that, regardless of the status of the war, he is entitled to have a military tribunal assess his Article 4 eligibility for POW status pursuant to Army Regulation 190-8. Meanwhile, the Government has wavered between arguing that the Executive Branch has rendered unassailable determinations on the relevant Third Convention issues and contending that those issues should be decided by the courts, albeit with some deference to the Executive's views.
 

 Indeed, the Government has asserted both that the Executive's "determinations constitute a classic exercise of the President's war powers and his authority over foreign affairs,"
 
 see
 
 Suppl. Br. of Appellee 13, and that "the judicial branch must render its own decision on the availability of immunity to criminal charges here,"
 
 see
 
 Second Suppl. Br. of Appellee 14. With respect to each premise, the Government invokes a statement issued by President George W. Bush on February 7, 2002 (the "2002 Presidential Statement"), which deemed the war against the Taliban to be an Article 2 international armed conflict but purported to categorically exclude Taliban fighters from POW status under Article 4. According to the Government, the Executive explicitly-or maybe just implicitly-abandoned the 2002 Presidential Statement's Article 2 judgment by 2009. The Government insists, however, that the Executive continues to adhere to the Statement's sweeping Article 4 ruling-notwithstanding widespread condemnation of that ruling, including criticism from the Supreme Court and the Government's own expert witness.
 

 In my view, these circumstances demand a clear statement from the Executive Branch on whether Hamidullin should be accorded POW status and, if not, an explanation as to why not. Contrary to the Government, the Executive has not already rendered Article 2 and Article 4 determinations to which we can or should defer. Yet I agree with the Government insofar as it contends the Third Convention questions are initially for the Executive, not the courts. Consequently, I would remand this matter for the limited purpose of the Executive's consideration and explanation of Hamidullin's POW status. Such a remand would not necessarily include the military tribunal sought by Hamidullin. Perhaps instead, the President would pronounce that the war against the Taliban was not an Article 2 international armed conflict at the time of Hamidullin's capture in late 2009. Or perhaps the President would endorse the 2002 Presidential Statement's categorical Article 4 ruling and proclaim its continuing applicability. Or perhaps the President would elect to bestow POW protections upon Hamidullin, regardless of Article 2 and Article 4, in an effort to obtain reciprocal treatment of U.S. forces. Whatever the Executive would decide, we would have the opportunity for an informed and appropriate review upon this matter's return to our Court.
 

 My distinguished colleagues, however, reckon that the Third Convention questions are a matter of treaty interpretation primarily for the Judiciary, not the Executive Branch.
 
 See
 

 ante
 
 at 71-72 (explaining that "there can be no question that it is the role of the judiciary, not the executive, to interpret treaties," though "the executive may engage in the interpretation of treaties in [certain circumstances and thereby] inform the judiciary's own interpretations").
 

 Like the district court, my friends resolve the conflicting evidence and authorities to confidently declare that Hamidullin cannot be a POW. Nonetheless, the panel majority takes a tack different from the district court's. That is, the majority makes an original determination that the war against the Taliban was no longer an Article 2 international armed conflict by 2009.
 
 See
 

 id.
 
 at 69 ("We conclude, however, that at the time of Hamidullin's offense, the conflict in Afghanistan was not an international armed conflict, and therefore that the Army Regulation 190-8 and the [Third Convention] requirement that POW status be determined by a competent tribunal does not apply."). Additionally, the majority rejects Hamidullin's argument that, regardless of the status of the war, Regulation 190-8 entitles him to have his Article 4 eligibility for POW status determined by a military tribunal. According to the majority, agreeing with Hamidullin on that point would strip the federal courts of the jurisdiction to interpret treaties, as well as the jurisdiction to adjudicate crimes, and would flout the 2002 Presidential Statement's Article 4 ruling.
 
 See
 

 id.
 
 at 73 ("Hamidullin not only asks this Court to abdicate our duty to decide cases properly within our jurisdiction, but also asks us to ignore the legal determination already made by the President of the United States .... We cannot allow Hamidullin's interpretation of Army Regulation 190-8 to upend our system of governance.").
 

 With all respect for my good friends, their analysis is unsound and their forecast of constitutional chaos is unfounded. To truly respect the separation of powers, we could and should remand this matter for the Executive Branch's determination of the Third Convention issues, not resolve those questions ourselves. Unfortunately, however, the panel majority has rejected this prudent and reasonable course, compelling me to write separately in dissent.
 

 I.
 

 I begin with a discussion of the Geneva Conventions. Because the United States is a High Contracting Party to those Conventions, they are among "the supreme Law of the Land," pursuant to the Supremacy Clause of our Constitution.
 
 See
 
 U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land ...."). As the Supreme Court has recognized, the Geneva Conventions are an integral "part of the law of war."
 
 See
 

 Hamdan v. Rumsfeld
 
 ,
 
 548 U.S. 557
 
 , 628,
 
 126 S.Ct. 2749
 
 ,
 
 165 L.Ed.2d 723
 
 (2006).
 

 A.
 

 In this appeal, we are chiefly concerned with the Third Geneva Convention, which addresses the treatment of POWs.
 
 See
 
 Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135. Under its Article 2, the Third Convention applies "to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties," as well as "to all cases of partial or total occupation of the territory of a High Contracting Party."
 

 In an Article 2 international armed conflict, persons who have fallen into the power of the enemy qualify as POWs under Article 4 if they are within one of six categories. For example, the first category of POWs encompasses "[m]embers of the armed forces of a Party to the conflict, as well as members of militias or volunteer corps forming part of such armed forces."
 
 See
 
 Third Geneva Convention art. 4(A)(1).
 

 The second category-enumerated in Article 4(A)(2)-includes the following:
 

 Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a Party to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfil the following conditions:
 

 (a) that of being commanded by a person responsible for his subordinates;
 

 (b) that of having a fixed distinctive sign recognizable at a distance;
 

 (c) that of carrying arms openly;
 

 (d) that of conducting their operations in accordance with the laws and customs of war.
 

 The third category of POWs is defined in Article 4(A)(3) as "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power." None of the other three categories is relevant here.
 

 Pursuant to Article 5 of the Third Convention, POW status endures "from the time [the persons] fall into the power of the enemy ... until their final release and repatriation." Article 5 also provides:
 

 Should any doubt arise as to whether persons having committed a belligerent act and having fallen into the hands of the enemy belong to any of the categories enumerated in Article 4, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.
 

 See
 
 Third Geneva Convention art. 5. A significant protection conferred on POWs is immunity from criminal prosecution in the civilian and military courts for acts that do not violate the law of war.
 
 See, e.g.
 
 ,
 

 id.
 

 arts. 85, 87, 99.
 

 When there is an "armed conflict not of an international character," Article 3 of the Third Convention affords some protections, but only to those "[p]ersons taking no active part in the hostilities," or the wounded or sick. Accordingly, in an Article 3 non-international armed conflict, POW status is not available.
 

 B.
 

 With regard to the Third Convention's execution, Article 128 requires the High Contracting Parties to communicate to one another "the laws and regulations which they may adopt to ensure the application [of the Convention]." In the United States, the relevant requirements of the Third Convention have been incorporated into an Executive Branch regulation adopted by the U.S. Army, as well as the Navy, the Air Force, and the Marine Corps. That multi-service regulation is Army Regulation 190-8. Additionally, the Army relies on Army Field Manual 27-10, aptly entitled
 
 The Law of Land Warfare
 
 .
 

 As explained in its "Purpose" section, Army Regulation 190-8 "implements international law, both customary and codified, relating to," among others, enemy prisoners of war and other detainees.
 
 See
 
 Army Reg. 190-8 at § 1-1(a) to (b). Moreover, Regulation 190-8 explicitly identifies the Third Convention as one of the "principal treaties relevant to this regulation."
 

 Id.
 

 § 1-1(b)(3).
 

 Army Regulation 190-8 does not specify who determines whether a conflict is an international armed conflict under Article 2 of the Third Convention or a non-international armed conflict under the Convention's Article 3. In its "General protection policy" section, however, Regulation 190-8 provides that "[a]ll persons taken into custody
 by U.S. forces will be provided with the protections of the [Third Convention] until some other legal status is determined by competent authority."
 
 See
 
 Army Reg. 190-8 at § 1-5(a)(2).
 

 Elsewhere, in its "Tribunals" section, Army Regulation 190-8 recognizes that a person not undoubtedly excluded from POW status under Article 4 of the Third Convention is entitled to be treated as a POW pending a determination of his status by "a competent tribunal" under the Convention's Article 5. That is, Regulation 190-8 specifies:
 

 In accordance with Article 5 ..., if any doubt arises as to whether a person, having committed a belligerent act and been taken into custody by the US Armed Forces, belongs to any of the categories enumerated in Article 4 ..., such persons shall enjoy the protection of the [Third] Convention until such time as their status has been determined by a competent tribunal.
 

 See
 
 Army Reg. 190-8 at § 1-6(a). Furthermore, Regulation 190-8 applies the Article 5 competent tribunal requirement to certain persons simply claiming POW status:
 

 A competent tribunal shall determine the status of any person not appearing to be entitled to prisoner of war status who has committed a belligerent act or has engaged in hostile activities in aid of enemy armed forces, and who asserts that he or she is entitled to treatment as a prisoner of war, or concerning whom any doubt of a like nature exists.
 

 Id.
 

 § 1-6(b).
 

 The "Tribunals" section of Army Regulation 190-8 spells out in detail the composition of an Article 5 competent tribunal. It provides that the tribunal be comprised of three commissioned officers, at least one of whom must be of a field grade (a Major, Lieutenant Colonel, or Colonel), and that the senior ranking officer will serve as President of the tribunal.
 
 See
 
 Army Reg. 190-8 at § 1-6(c). Regulation 190-8 also requires another non-voting officer-preferably an officer in the Judge Advocate General Corps-to serve as recorder during the tribunal proceedings.
 

 Id.
 

 The Regulation specifies that the "convening authority shall be a commander exercising general courts-martial convening authority."
 

 Id.
 

 § 1-6(d). It also covers numerous procedural matters, such as the burden of proof (preponderance of the evidence) and the process of determination (closed session by a majority of the voting members of the tribunal).
 

 Id.
 

 § 1-6(e)(9).
 
 [1]
 

 Consistent with Army Regulation 190-8, the Army's Field Manual on
 
 The Law of Land Warfare
 
 provides that, "[s]hould any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4 ..., such persons shall enjoy the protection of the [Third] Convention until such time as their status has been determined
 by a competent tribunal."
 
 See
 
 Field Manual 27-10 at 30 (citing Third Geneva Convention art. 5). The Field Manual interprets Article 4 to apply "to any person not appearing to be entitled to prisoner-of-war status who has committed a belligerent act or has engaged in hostile activities in aid of the armed forces and who asserts that he is entitled to treatment as a prisoner of war or concerning whom any other doubt of a like nature exists."
 

 Id.
 

 The Manual describes a "competent tribunal" as "a board of not less than three officers acting according to such procedure as may be prescribed for tribunals of this nature."
 

 Id.
 

 II.
 

 With that background and legal framework in mind, I turn to a more comprehensive account of the tortuous proceedings leading to today's faulty decision of the panel majority.
 

 A.
 

 Hamidullin, a Russian national fighting on behalf of the Taliban and its affiliate the Haqqani Network, was the lone enemy survivor of an attack against U.S. and Afghan forces at Camp Leyza in eastern Afghanistan in November 2009. After the U.S. Army captured Hamidullin, he was indicted in the Eastern District of Virginia on criminal charges arising from the attack. Significantly, nothing in the record explains how or why Hamidullin was transferred from military to civilian custody, or how he ended up in Virginia.
 

 The initial indictment against Hamidullin was returned by the grand jury in Richmond in October 2014 and twice superseded, most recently in April 2015 by the operative indictment in Hamidullin's trial (the "Indictment"). The Indictment charged fifteen offenses, all under Title 18 of the United States Code: conspiracy to provide material support to terrorists ( § 2339A ); providing material support to terrorists ( § 2339A ); conspiracy to destroy an aircraft of the armed forces of the United States ( § 32 ); attempting to destroy an aircraft of the armed forces of the United States ( § 32 ); conspiracy to kill an officer or employee of the United States or a person assisting such officer or employee (§ 1117); two counts of attempting to kill an officer or employee of the United States or a person assisting such officer or employee (§ 1114); conspiracy to murder a national of the United States (§ 2332(b) ); two counts of attempting to murder a national of the United States (§ 2332(b) ); two counts of engaging in physical violence with intent to cause serious bodily injury to a national of the United States (§ 2332(c) ); conspiracy to use a weapon of mass destruction (§ 2332a); possession of a firearm in connection with a crime of violence (§ 924(c) ); and conspiracy to possess a firearm in connection with a crime of violence (§ 924(o) ). Several of the charges included allegations under
 
 18 U.S.C. § 2
 
 of aiding and abetting.
 

 Hamidullin promptly moved in the district court for dismissal of the Indictment, invoking Rule 12(b)(1) of the Federal Rules of Criminal Procedure. Hamidullin sought dismissal of the criminal charges on multiple grounds, including that, pursuant to the Third Geneva Convention, he is a POW who did not violate the law of war and thus cannot be prosecuted in a civilian or military court. Hamidullin has decried his prosecution for being "premised on the radical conceit that in Afghanistan, only one side of an ongoing war is authorized to shoot."
 
 See
 
 Opening Br. of Appellant 14. He has proffered that he should instead "be detained as an enemy combatant for the duration of hostilities in Afghanistan."
 

 Id.
 

 at 13
 
 .
 

 B.
 

 As previously explained, the Third Geneva Convention issues relevant to Hamidullin's POW claim are whether the war in Afghanistan against the Taliban was an international armed conflict within the meaning of the Third Convention's Article 2 at the time of Hamidullin's capture in late 2009, and whether Hamidullin falls within one of the six categories of POWs articulated in the Convention's Article 4. Those disputed issues were presented by the parties to the district court for initial consideration, rather than first being determined by the Executive Branch.
 

 1.
 

 In June 2015, the district court conducted a hearing on Hamidullin's motion to dismiss and heard evidence from the parties' expert witnesses on the Third Convention issues, generating hundreds of pages of transcribed testimony and a multitude of exhibits. The witnesses explained in some detail the background of the Taliban and the Haqqani Network with which the Taliban was affiliated. The witnesses also explained the status of the government of Afghanistan from the September 11, 2001 terrorist attacks on the United States until Hamidullin's capture in 2009. That is, in the view of the United States and most other countries, the Taliban constituted the de facto government of Afghanistan until it was ousted from power in late 2001. Only three countries (Pakistan, the United Arab Emirates, and Saudi Arabia) had ever given diplomatic recognition to the Taliban as Afghanistan's de jure government, and each withdrew its recognition shortly after the 2001 terrorist attacks. The Taliban was replaced by the de jure government of Hamid Karzai, which began as an interim government in late 2001 and then was elected in 2004. Over the years, the Karzai government has been accorded diplomatic recognition by the United States and many other countries. The United States and allies have continued to assist Afghan forces in fighting the Taliban.
 

 The evidence admitted at the hearing and addressed by expert witnesses included the 2002 Presidential Statement-a statement that followed the Taliban's ouster from power in Afghanistan, came during the Karzai government's interim rule, and preceded Hamidullin's capture by more than seven years. By that statement, the President declared "that the provisions of [the Third] Geneva [Convention] will apply to our present conflict with the Taliban."
 
 See
 
 2002 Presidential Statement at 1. In other words, the President determined that, at least as of early 2002, the war against the Taliban constituted an Article 2 international armed conflict. The 2002 Presidential Statement advised, however, that Taliban detainees are categorically excluded from POW status under Article 4.
 
 See
 

 id.
 

 at 2
 
 ("I determine that the Taliban detainees are unlawful combatants and, therefore, do not qualify as prisoners of war under Article 4 of [the Third] Geneva [Convention].").
 

 During the hearing, the expert witnesses also addressed various materials invoked by the parties in support of their respective positions. The Government submitted, for example, a 2007 report of the International Committee of the Red Cross (the "ICRC") deeming the ongoing hostilities in Afghanistan to be an Article 3 non-international armed conflict-"albeit with an international component in the form of a foreign military presence on one of the sides"-"because it is being waged with the consent and support of the respective domestic authorities and does not involve two opposed States."
 
 See
 
 Int'l Comm. of the Red Cross,
 
 International Humanitarian Law and the Challenges of Contempo
 

 rary Armed Conflicts
 
 , 89 Int'l Rev. of the Red Cross, 719, 725 (2007).
 

 In support of the argument that the war against the Taliban remains an Article 2 international armed conflict because it began as one, Hamidullin presented, inter alia, a 1995 submission made by the U.S. Government itself in a war crimes prosecution in the United Nations International Criminal Tribunal for the former Yugoslavia. There, the Government asserted that "it is artificial and improper to attempt to divide [a conflict] into isolated segments, either geographically or chronologically, in an attempt to exclude the application of [the Third Convention]."
 
 See
 
 Submission of the Government of the United States of America Concerning Certain Arguments Made by Counsel for the Accused at 28,
 
 The Prosecutor of the Tribunal v. Dusko Tadic
 
 , No. IT-94-1 (ICTY July 17, 1995).
 

 The expert witnesses at the district court's June 2015 hearing disagreed on the applicability of the Third Convention to Hamidullin and other Taliban and Haqqani fighters. One of the Government's witnesses testified that-although the United States had initially characterized the war against the Taliban as an international armed conflict under the Convention's Article 2-the war became an Article 3 non-international armed conflict after the Karzai government was elected in 2004. That witness acknowledged that the 2002 Presidential Statement deeming the war to be an Article 2 international armed conflict had "never been officially changed."
 
 See
 
 J.A. 368.
 
 [2]
 
 The witness also recognized that there was precedent, arising from the
 
 Tadic
 
 war crimes prosecution in the mid-1990s, for the proposition that the United States should continue to treat the war as an international armed conflict because of its initial characterization.
 

 Id.
 

 at 376
 
 . In addition, the witness observed that the United States' longstanding "practice has been to follow the rules for an international armed conflict without making a legal determination as to whether they apply," based on "a hope for reciprocity if our personnel fall into enemy hands."
 

 Id.
 

 at 326
 
 . Nevertheless, the witness insisted that there "was a sea change in how some of these things were looked at" following the September 11, 2001 terrorist attacks.
 

 Id.
 

 at 376
 
 . Consistent with the 2007 ICRC report, the witness concluded that the war against the Taliban had become an Article 3 non-international armed conflict and thus that the Convention's Article 4 protections for POWs were not available in 2009 to forces of the Taliban and the Haqqani Network.
 

 The same witness further opined that, even assuming the war against the Taliban qualified as an international armed conflict in 2009, no Taliban and Haqqani fighters can satisfy Article 4 criteria for POWs. The witness premised that conclusion on an independent analysis, without relying on the 2002 Presidential Statement's Article 4 determination. Importantly, the witness acknowledged that the 2002 Presidential Statement's Article 4 determination was "flawed" and "politically based rather than based on law," in that it did not take all of the Article 4 factors into account.
 
 See
 
 J.A. 400-01 (confirming his view that "President Bush erred in accepting the advice of individuals who lacked military experience and ... possessed skepticism, if not [disdain,] for the law of war, over [the advice] of individuals with military combat and substantial law of war expertise
 and experience" (internal quotation marks omitted) ).
 

 By contrast, Hamidullin's expert witness testified that-because the war against the Taliban began as an Article 2 international armed conflict-it remained so through 2009 and beyond. That witness also rejected the notion that the war may be characterized as an Article 3 non-international armed conflict, relying on news reports that the United States had attacked Taliban targets outside Afghanistan (in Pakistan), and that Pakistan and Iran have supplied the Taliban with troops, weapons, and other materials.
 
 See
 
 J.A. 440 (acknowledging that "[s]ome of this may be classified" and thus verifiable only by government officials and others with appropriate security clearances). As for the Article 4 issue, the witness maintained that Taliban and Haqqani fighters are eligible for POW status under Article 4(A)(1) and (A)(3), as members of the armed forces of a government-in-exile.
 

 2.
 

 In July 2015, following the evidentiary hearing, the district court denied the motion to dismiss the Indictment, ruling, inter alia, that Hamidullin is not a POW. In so doing, the court explained that the complexity of its analysis was compounded by a dearth of judicial authority applying the law of war to the conflict in Afghanistan. As the court observed, "[w]hile the legal landscape is filled with respectable military and scholarly treatises, along with a host of public policy position papers, few courts have had occasion to venture into this terrain."
 
 See
 

 Hamidullin
 
 ,
 
 114 F.Supp.3d at 367-68
 
 . The court characterized the central issue with respect to Hamidullin's POW claim as "whether the Taliban [and its Haqqani allies] are lawful combatants entitled to prisoner of war treatment under the [Third] Geneva Convention, or a band of insurgent outlaws to be dealt with as criminals."
 

 Id.
 

 at 387
 
 . To answer that inquiry, the court related that it was not necessary to "determine whether the conflict in Afghanistan is international in nature as contemplated by Article 2."
 

 Id.
 

 Indeed, the court observed not only that the parties' expert witnesses disagreed on the Article 2 issue, but that the issue "may elude a definitive answer."
 

 Id.
 

 To "surmount[ ] this hurdle," the court simply assumed that the war against the Taliban was an Article 2 international armed conflict at the time of Hamidullin's capture and proceeded to its own Article 4 analysis.
 

 Id.
 

 Pursuant to its Article 4 analysis, the district court concluded that Hamidullin is not eligible for POW status.
 
 See
 

 Hamidullin
 
 ,
 
 114 F.Supp.3d at 387-88
 
 (summarily ruling that Taliban and Haqqani fighters do not satisfy Article 4(A)(1) and (A)(3), and further ruling, with explanation, that such fighters also fail Article 4(A)(2) ). In rendering its analysis, the court did not invoke or evidently accord any deference to the 2002 Presidential Statement's Article 4 determination. Furthermore, the court did not acknowledge either the Third Convention's requirement for Article 5 proceedings before a "competent tribunal," or Army Regulation 190-8's directive that Article 5 proceedings in the United States are to be conducted by a tribunal of three commissioned military officers. In the circumstances, the court also did not address whether or how a U.S. court could be a "competent tribunal" authorized to conduct Article 5 proceedings and decide a POW claim.
 
 [3]
 

 C.
 

 By their opening appellate briefs, the parties disputed the correctness of the district court's POW determination-but they did not question the court's authority to decide Hamidullin's POW status in the first instance.
 

 Notably, the Government argued that the 2002 Presidential Statement's categorical exclusion of Taliban fighters from POW status under Article 4 "is entitled to a degree of deference as a reasonable interpretation and application of the [Third Geneva Convention] to the Taliban by the Commander in Chief."
 
 See
 
 Opening Br. of Appellee 34. The Government specified, however, that it did "not argue that the President's determination is dispositive of [Hamidullin's POW claim]."
 

 Id.
 

 As the Government explained, that is why it "submitted its evidence to the district court for determination and to this Court for appellate review."
 

 Id.
 

 Concurrently, the Government urged us to reach the Article 2 issue and resolve it based on authorities invoked in the district court, including the ICRC and its 2007 report.
 
 Id.
 
 at 28 (contending that, "[a]t the time of Hamidullin's attack, there was no international conflict between the United States and Afghanistan"). The Government did not then assert that the Article 2 issue had already been decided by the Executive Branch.
 

 During the initial oral argument in this appeal, in December 2016, we questioned the parties about the district court's authority to decide Hamidullin's POW status in the first instance. Soon thereafter, we received from the Government what it purported was a definitive Executive Branch statement on the nature of the war against the Taliban: a December 2016 report signed by President Barack Obama and entitled
 
 Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations
 
 (the "2016 Presidential Report"). The 2016 Presidential Report indicated that the war in Afghanistan against the Taliban was an Article 3 non-international armed conflict as of late 2016, without explaining when the war transformed from an Article 2 international armed conflict or specifying the status of the war at the time of Hamidullin's capture in late 2009. For example, the Report stated that "the United States is currently engaged in hostilities against only non-State actors," i.e., non-international armed conflicts.
 
 See
 
 2016 Report at 19. That statement did not concern the nature of the war against the Taliban in late 2009, the time relevant to Hamidullin's POW claim. Elsewhere, the Report referred to non-international armed conflicts "such as the hostilities authorized by the 2001 [Authorization for Use of Military Force (the 'AUMF') ]."
 
 Id.
 
 at 32. As the Supreme Court explained in
 
 Hamdan v. Rumsfeld
 
 , the AUMF authorized both the war against al Qaeda (a non-international armed conflict) and the war against the Taliban (at least initially an international armed conflict).
 
 See
 

 548 U.S. 557
 
 , 568,
 
 126 S.Ct. 2749
 
 ,
 
 165 L.Ed.2d 723
 
 (2006). Thus, the 2016 Presidential Report's reference to non-international armed conflicts authorized by the AUMF did not specify the nature of the war against the Taliban in late 2009.
 

 Additionally, the 2016 Presidential Report advised that "the United States often applies policies that are more restrictive than what would be required as a matter of law," leaving open the possibility that Hamidullin could be accorded POW status even if the Executive considers the war against the Taliban to be a non-international armed conflict.
 
 See
 
 2016 Report at 19. Nonetheless, when it submitted the Report to this Court, the Government asserted that the Report "reflects the United States' view that the conflict in Afghanistan is a non-international armed conflict," and "[t]hat conclusion alone" renders POW status unavailable to Hamidullin.
 
 See
 
 Letter under Fed. R. App. P. 28(j) at 1,
 
 United States v. Hamidullin
 
 , No. 15-4788 (4th Cir. Dec. 14, 2016), ECF No. 42. The Government also repeated arguments aimed at convincing us to affirm the district court's determination that Hamidullin does not qualify as a POW under Article 4.
 

 In response, Hamidullin confirmed his view that the characterization of a war as an Article 2 international armed conflict or an Article 3 non-international armed conflict "is for the Court, not the Executive."
 
 See
 
 Response to Letter under Fed. R. App. P. 28(j) at 1,
 
 United States v. Hamidullin
 
 , No. 15-4788 (4th Cir. Dec. 15, 2016), ECF No. 43. For that proposition, Hamidullin relied on the Supreme Court's decision in
 
 Hamdan
 
 , 548 U.S. at 629-31,
 
 126 S.Ct. 2749
 
 (rejecting the 2002 Presidential Statement's conclusion that the war against al Qaeda was neither an Article 2 international armed conflict nor an Article 3 non-international armed conflict). Hamidullin's response also invoked
 
 Hamdi v. Rumsfeld
 
 ,
 
 542 U.S. 507
 
 , 550,
 
 124 S.Ct. 2633
 
 ,
 
 159 L.Ed.2d 578
 
 (2004) (Souter, J., concurring in part, dissenting in part, and concurring in the judgment), to contest the President's ability to categorically exclude detainees from POW protections under Article 4, as the 2002 Presidential Statement had endeavored to do.
 

 Several months later, in June 2017, we directed the parties to file supplemental briefs addressing the issue of the district court's "jurisdiction to decide, in the first instance, whether Hamidullin qualifies as a prisoner of war under the Third Geneva Convention."
 
 See
 
 Order at 1,
 
 United States v. Hamidullin
 
 , No. 15-4788 (4th Cir. June 23, 2017), ECF No. 48. In so doing, we advised that "[t]he briefs should discuss the effect of Army Regulation 190-8 on the court's jurisdiction."
 

 Id.
 

 The parties simultaneously filed supplemental opening and response briefs.
 

 Strikingly, the Government's supplemental briefs contended that the Third Convention determinations relevant to Hamidullin's POW claim "are properly made by the Commander-in-Chief or other higher authorities in the Executive Branch"-not a military tribunal or, by implication, a federal court.
 
 See
 
 Suppl. Br. of Appellee 7;
 
 see also
 

 id.
 
 at 8 (reiterating that "overarching questions, such as the appropriate classification of the conflict, ... properly belong to higher authorities within the Executive Branch"). In addition to asserting that the Third Convention issues were for the Executive to decide, the Government declared that the Executive had in fact made the relevant determinations herein, i.e., that the war against the Taliban was an Article 3 non-international armed conflict by late 2009 (apparently based on the 2016 Presidential Report), and that, in any event, Taliban fighters are categorically excluded from POW status under Article 4 (based on the 2002 Presidential Statement).
 

 Of course, the Government had previously treated the district court as the appropriate first adjudicator of the Third Convention issues and had conceded that the 2002 Presidential Statement was not
 dispositive of Hamidullin's POW claim. Without acknowledging or explaining its significant change of position, the Government now insisted that "Hamidullin's legal status has been determined by a 'competent authority' within the meaning of [Army Regulation 190-8] because the President-the highest 'competent authority' on the subject-conclusively determined in 2002 that Taliban detainees such as Hamidullin do not qualify for POW status."
 
 See
 
 Suppl. Br. of Appellee 2. From there, the Government defended the district court's disposition of Hamidullin's POW claim as consistent with Regulation 190-8 and the Executive's pronouncements because there is no doubt that Hamidullin is ineligible to be deemed a POW. The Government also cautioned us, in emphatic terms, that
 

 [t]he Executive's determinations regarding the character of the conflict, the status of the Taliban, and the proper application of the [Third Convention] and [Regulation] 190-8 are entitled to great deference by this Court. These determinations constitute a classic exercise of the President's war powers and his authority over foreign affairs that also implicates his exclusive authority to determine whether a foreign government merits recognition.
 

 Id.
 
 at 13.
 

 In his supplemental briefs, Hamidullin for the first time argued that Army Regulation 190-8 requires that a military tribunal determine his POW status, and that such a determination is a prerequisite to his criminal prosecution. According to Hamidullin, "[b]ecause the Executive Branch failed to follow its own regulation and the [Third Convention] in this case, [he] retains status as a prisoner of war and is immune from ordinary criminal liability," thereby necessitating that we "vacate his convictions and remand with the direction that he be transferred to the custody of the U.S. military and afforded treatment in accordance with Army Regulation 190-8."
 
 See
 
 Suppl. Br. of Appellant 14-15. Hamidullin stood by his position that the war against the Taliban remains an Article 2 international armed conflict, but contended that the status of the war is irrelevant, in that "[n]othing in [Regulation 190-8's] language limits [its] application based on the type of conflict in which a person is seized."
 
 See
 
 Suppl. Response Br. of Appellant 2 (invoking the provision of Regulation 190-8 at § 1-5(a)(2) that "
 
 [a]ll
 
 persons taken into custody by U.S. forces will be provided with the protections of the [Third Convention] until some other legal status is determined by competent authority" (emphasis added) ). Hamidullin also asserted "that a detainee's seizure by U.S. forces in armed conflict coupled with an assertion of prisoner of war status is equivalent to 'doubt' which requires the detainee to be treated as a POW until a competent tribunal, as defined by [Regulation 190-8], decides otherwise."
 
 Id.
 
 at 3 (citing Army Reg. 190-8 at § 1-6(b) ). Moreover, Hamidullin criticized the Government for relying on the 2002 Presidential Statement and ignoring "the near-universal conclusion, since [the Statement] was issued, that the President's [Article 4] determination violated the [Third Convention] and [Regulation] 190-8."
 
 Id.
 
 at 4.
 

 Following our announcement that the second oral argument in this matter would be held in December 2017, the Government opted to file an additional supplemental brief. No longer arguing that the relevant Third Convention issues were conclusively determined by the 2016 Presidential Report and the 2002 Presidential Statement, the Government seemed to revert to its original position that it was up to the courts to decide whether the war against the Taliban was an Article 2 international armed conflict in late 2009 and whether Hamidullin is eligible for POW
 

 status under Article 4. The Government merely included the 2016 Presidential Report in a string of authorities cited for the purpose of convincing us to find that the war had become an Article 3 non-international armed conflict prior to Hamidullin's capture. Meanwhile, the Government did not explicitly reference the 2002 Presidential Statement at all. Rather, the Government mentioned only that the Executive Branch "has specifically determined that members of the Taliban are not entitled to POW protections," and did so only in the course of urging us to affirm the POW determination made by the district court.
 
 See
 
 Second Suppl. Br. of Appellee 14 ("To be sure, the judicial branch must render its own decision on the availability of immunity to criminal charges here. But a joint judgment of the political branches in this arena is entitled to the utmost deference from this Court.").
 

 At the second oral argument, however, the Government revived its theory that the Executive Branch has already answered the Article 2 and Article 4 questions. Rather than crediting the 2016 Presidential Report with deciding the Article 2 issue, the Government asserted it is implicit in the manner the United States has carried out the war against the Taliban since 2001 that the Executive Branch changed the status of the war from an Article 2 international armed conflict to an Article 3 non-international armed conflict by 2009. With respect to the Article 4 issue, the Government reiterated its reliance on the 2002 Presidential Statement. For his part, Hamidullin stood firm that the Article 2 question is for the courts, but that Army Regulation 190-8 in any event guarantees a military tribunal's assessment of his POW status under Article 4.
 

 D.
 

 That brings us to today, when my friends of the panel majority have taken it upon themselves-under the guise of treaty interpretation-to resolve the conflicting evidence and authorities to make their original determination that the war against the Taliban was no longer an Article 2 international armed conflict by 2009. Additionally, the majority rejects Hamidullin's argument that, regardless of the status of the war, Regulation 190-8 entitles him to have his Article 4 eligibility for POW status determined by a military tribunal. According to the majority, its decision safeguards the courts' jurisdiction to interpret treaties and adjudicate crimes, and also respects the 2002 Presidential Statement. As explained below, however, the majority actually usurps the authority of the Executive Branch and fails to grapple with significant questions surrounding the enforceability of the 2002 Presidential Statement's categorical Article 4 ruling. I therefore must dissent from the majority's decision.
 

 III.
 

 As I see it, the Third Geneva Convention questions underlying Hamidullin's POW claim are initially for the Executive Branch, not the Judiciary. Crucially, we are asked here not to simply interpret the Third Convention-as the Judiciary is entirely capable and qualified to do-but to determine whether the Convention applies to particular hostilities and a particular detainee. In the circumstances, I believe we must refer the Third Convention questions to the Executive for first consideration and then review its answers as appropriate. Indeed, the Government itself espoused in its original supplemental brief that it is the Executive's role to determine "the character of the conflict, the status of the Taliban, and the proper application of the [Third Convention] and [Army Regulation] 190-8," as those "determinations constitute a classic exercise of the President's
 war powers and his authority over foreign affairs that also implicates his exclusive authority to determine whether a foreign government merits recognition."
 
 See
 
 Suppl. Br. of Appellee 13 (relying on
 
 Zivotofsky v. Kerry
 
 , --- U.S. ----,
 
 135 S.Ct. 2076
 
 , 2086,
 
 192 L.Ed.2d 83
 
 (2015), for the proposition that "[r]ecognition is a topic on which the Nation must speak with one voice," and "[t]hat voice must be the President's" (alteration and internal quotation marks omitted) );
 
 see also, e.g.
 
 ,
 
 Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.
 
 ,
 
 333 U.S. 103
 
 , 109,
 
 68 S.Ct. 431
 
 ,
 
 92 L.Ed. 568
 
 (1948) (generally recognizing that the President "possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs").
 

 A.
 

 That we should not deem ourselves to be the primary arbiters of the Third Convention questions is demonstrated by the Supreme Court's decision in
 
 Hamdan v. Rumsfeld
 
 ,
 
 548 U.S. 557
 
 ,
 
 126 S.Ct. 2749
 
 ,
 
 165 L.Ed.2d 723
 
 (2006).
 
 [4]
 
 The
 
 Hamdan
 
 matter involved a Yemeni national and alleged member of al Qaeda who was captured in Afghanistan, turned over to the U.S. military, and imprisoned in Guantanamo Bay, Cuba. The question was whether Hamdan could be tried on a criminal conspiracy charge by a U.S. military commission. Of particular relevance here, the
 
 Hamdan
 
 Court concluded "that the military commission convened to try Hamdan lacks power to proceed because its structure and procedures violate ... the Geneva Conventions."
 
 See
 
 548 U.S. at 567,
 
 126 S.Ct. 2749
 
 .
 

 As part of its analysis, the
 
 Hamdan
 
 Court recognized that there was a distinction between the war against the Taliban-which was accepted at that time as an Article 2 international armed conflict based on the 2002 Presidential Statement-and the war against al Qaeda.
 
 See
 
 548 U.S. at 628-29 & n.60,
 
 126 S.Ct. 2749
 
 . The 2002 Presidential Statement declared that the separate war against al Qaeda was neither an Article 2 international armed conflict nor an Article 3 non-international conflict, potentially rendering Hamdan ineligible for any Third Convention protections at all.
 

 Id.
 

 at 628-30
 
 ,
 
 126 S.Ct. 2749
 
 .
 

 Significantly, the Third Convention issue presented in
 
 Hamdan
 
 -whether Hamdan could be tried by military commission because the war against al Qaeda was neither an Article 2 international armed conflict nor an Article 3 non-international armed conflict-was first decided by the Executive Branch and then presented to the courts for review. And, in assessing that issue, the Supreme Court expressly refrained from examining the characteristics of the war against al Qaeda and declaring it to be either an international or non-international armed conflict.
 
 See
 

 Hamdan
 
 , 548 U.S. at 629,
 
 126 S.Ct. 2749
 
 . Rather, the Court cautiously confined itself to a straightforward interpretation of the Third Convention sufficient to dispose of Hamdan's appeal. That is, the Court determined, premised on the Third Convention's language, that any conflict that does not constitute an Article 2 international conflict must be an Article 3 non-international conflict.
 

 Id.
 

 at 629-31
 
 ,
 
 126 S.Ct. 2749
 
 . From there, the Court ruled that Hamdan was entitled at a minimum to the protections of Article 3, and that the military commission convened to try him contravened Article 3's requirements.
 

 Id.
 

 at 631-32
 
 ,
 
 126 S.Ct. 2749
 
 ("Article 3, then, is
 applicable here and ... requires that Hamdan be tried by a 'regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.").
 
 [5]
 

 As the panel majority would now have it, this Court-like the Supreme Court in
 
 Hamdan
 
 -is a simple treaty interpreter. Unlike the
 
 Hamdan
 
 Court, however, we are not reviewing an Executive Branch determination, and we cannot restrict ourselves to a clear-cut interpretation of the Third Convention. Instead, we are asked to determine in the first instance whether particular hostilities (the war against the Taliban, as of late 2009) constituted an Article 2 international armed conflict, and whether a particular detainee (Hamidullin) is eligible for Article 4 POW status. Despite those material distinctions and in contravention of
 
 Hamdan
 
 's cautious approach, the panel majority takes up the Third Convention questions.
 

 B.
 

 The unsuitability of leaving the Third Convention questions to the courts is also illustrated by the panel majority's decision, wherein the majority determines that when Hamidullin was captured by the U.S. Army in late 2009, "the conflict in Afghanistan was not an international armed conflict."
 
 See
 

 ante
 
 at 69. The Article 2 determination is premised on factual findings rendered by the majority, including that "[t]he conflict in Afghanistan began in 2001 as ... a conflict between the United States and its coalition partners on one side, and the Taliban-controlled Afghan government on the other," and that since "the Taliban lost control of the government and was replaced by a government led by Hamid Karzai," there merely has been a conflict in Afghanistan "against unlawful Taliban insurgents."
 
 Id.
 
 at 69-70.
 

 "It is axiomatic, however, as our Judge Hall eloquently explained, that appellate courts do not make factual findings."
 
 See
 

 Robinson v. Wix Filtration Corp.
 
 ,
 
 599 F.3d 403
 
 , 419 (4th Cir. 2010) (King, J., dissenting) (citing
 
 Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.
 
 ,
 
 56 F.3d 556
 
 , 575-76 (4th Cir. 1995) ("It is a basic tenet of our legal system that, although appellate courts often review facts found by a judge or jury ..., they do not make such findings in the first instance.") ). Furthermore, the panel majority's factual findings are on shaky evidentiary ground. The record contains only the evidence-much of it disputed-that the parties chose to present. And even that evidence casts doubt on the majority's findings.
 

 For example, in opining that the war against the Taliban cannot be characterized as an Article 3 non-international armed conflict, Hamidullin's expert witness pointed to news reports that the war has not been confined to Afghanistan (the United States having attacked Taliban targets in Pakistan), and that the Taliban has been supported by other countries (Pakistan and Iran having supplied troops, weapons, and other materials).
 
 See
 
 J.A. 440. The witness explained that the reported information was probably classified but could be verified by government officials with appropriate security clearances.
 

 Id.
 

 Yet the panel majority does not acknowledge
 or confront Hamidullin's evidence in finding that the war has been waged only in Afghanistan and solely against the Taliban. Nor does the majority express any concern over the record's lack of classified, but potentially pertinent, evidence.
 

 Further undermining the panel majority's decision is its reliance on debatable, non-binding authorities and so-called "[c]ommon sense."
 
 See
 

 ante
 
 at 70-71 (simplifying the issue to the supposedly commonsensical proposition that "[i]f the conflict in Afghanistan was originally an international armed conflict occurring between two 'High Contracting Parties'-the United States and the Afghan government-the conflict cannot remain international when the conflict between the recognized Afghan government and the United States has ceased"). The majority wholly ignores the compelling contrary authorities that led the district court to conclude, quite understandably, that the Article 2 question may be unanswerable-at least on the limited materials submitted in these court proceedings.
 

 Worse still, the panel majority allows for just two possibilities in its Article 2 analysis: first, that the war against the Taliban was an Article 2 international armed conflict in late 2009, leaving Hamidullin eligible to be adjudged a POW; or second, that the war was instead an Article 3 non-international armed conflict at the relevant time, excluding Hamidullin from POW status. An important third possibility would be available to the Executive Branch: that, notwithstanding the proper characterization of the war, Hamidullin may be treated as a POW. The 2016 Presidential Report reserved the right to exceed the requirements of the Third Convention, and the Government's expert witness recognized that the United States has long accorded POW status to detainees lacking legal entitlement in the hope of securing reciprocal treatment of U.S. forces. But, in the majority's conception of the courts as treaty interpreters, the Judiciary is without the authority to make such a discretionary judgment.
 

 C.
 

 Other problems surface in the panel majority's decision where it rejects Hamidullin's argument that, regardless of the status of the war against the Taliban, Army Regulation 190-8 entitles him to have his Article 4 eligibility for POW status determined by a military tribunal. According to Hamidullin, all detainees who claim to be POWs must be accorded military tribunals for determination of their status. To be clear, I am not saying that argument is meritorious. I do not reach the issue, which I believe should be referred to the Executive Branch as part of its initial consideration of the Third Convention questions. What I am saying is that the majority's reasons for rejecting Hamidullin's argument are untenable.
 

 1.
 

 First, the panel majority reasons that accepting Hamidullin's argument would strip the federal courts of the jurisdiction to interpret treaties and adjudicate crimes. In other words, the majority concludes that the courts possess the authority to decide in the first instance whether a detainee qualifies as a POW pursuant to Article 4 of the Third Convention-i.e., a federal court can be the "competent tribunal" required by the Convention's Article 5. I disagree. In the United States, Article 5 proceedings are to be conducted before a U.S. military tribunal.
 
 See
 
 Army Reg. 190-8 at § 1-6. Arguably, the President also may decide detainees' POW status under Article 4. But the Article 4 question is not one that can be answered initially by the courts.
 

 a.
 

 As previously explained, the Third Convention leaves it to the High Contracting Parties to adopt laws and regulations to ensure the Convention's application.
 
 See
 
 Third Geneva Convention art. 128. Thus, an Article 5 "competent tribunal is established by domestic law," and "[r]ules clarifying the tribunal's competence, composition and procedure must be provided by the detaining State."
 
 See
 
 Yasmin Naqvi,
 
 Doubtful Prisoner-of-War Status
 
 , 84 Int'l Rev. of the Red Cross 571, 593 (2002). Relevant to persons captured by the United States, Army Regulation 190-8 specifies the composition of an Article 5 competent tribunal-a military tribunal-and delineates the procedures to be followed in Article 5 proceedings. Among the extensive requirements and procedures spelled out in Regulation 190-8 is that the tribunal be comprised of three commissioned officers, with the senior ranking officer serving as the tribunal's President and an additional non-voting officer serving as its recorder.
 
 See
 
 Army Reg. 190-8 at § 1-6(c).
 

 Simply put, pursuant to Army Regulation 190-8, the United States has placed the responsibility for the Third Convention's Article 5 proceedings in the hands of military tribunals-not the federal courts. Because Regulation 190-8 has the force and effect of law, the courts are bound to respect and enforce it.
 
 See, e.g.
 
 ,
 
 Al Warafi v. Obama
 
 ,
 
 716 F.3d 627
 
 , 629 (D.C. Cir. 2013) ("Army Regulation 190-8 is domestic U.S. law ...."). The controlling legal authorities for that proposition extend to Supreme Court decisions nearly 200 years old.
 
 See
 

 Billings v. Truesdell
 
 ,
 
 321 U.S. 542
 
 , 551,
 
 64 S.Ct. 737
 
 ,
 
 88 L.Ed. 917
 
 (1944) ("War Department Regulations have the force of law ....");
 
 Standard Oil Co. v. Johnson
 
 ,
 
 316 U.S. 481
 
 , 484,
 
 62 S.Ct. 1168
 
 ,
 
 86 L.Ed. 1611
 
 (1942) ("[A]uthorized War Department regulations have the force of law.");
 
 Gratiot v. United States
 
 , 45 U.S. (4 How.) 80, 117,
 
 11 L.Ed. 884
 
 (1846) ("As to the army regulations, this court has too repeatedly said, that they have the force of law ....");
 
 United States v. Eliason
 
 , 41 U.S. (16 Pet.) 291, 302,
 
 10 L.Ed. 968
 
 (1842) ("The secretary of war is the regular constitutional organ of the president, for the administration of the military establishment of the nation; and rules and orders publicly promulged through him must be received as the acts of the executive, and as such, be binding upon all within the sphere of his legal and constitutional authority.").
 

 Contrary to the panel majority, Army Regulation 190-8's designation of military tribunals to conduct Article 5 proceedings does not strip the federal courts of jurisdiction to interpret treaties and adjudicate crimes. First of all, Article 4 POW determinations, as previously stated, are not matters of simple treaty interpretation within the province of the courts. Additionally, as Hamidullin has contended, Regulation 190-8's requirement that a military tribunal make Article 4 POW determinations simply serves as a legal prerequisite to criminal prosecution.
 
 See, e.g.
 
 ,
 
 18 U.S.C. § 249
 
 (b) (requiring certification from Attorney General before hate crimes prosecution may proceed);
 

 id.
 

 § 5032 (similarly mandating certification for juvenile prosecution);
 
 see also
 
 Suppl. Br. of Appellant 12 ("Analogous circumstances exist in which the government must comply with prerequisite steps before proceeding with a criminal prosecution." (citing §§ 249(b) and 5032 ) ).
 

 b.
 

 There also is no precedent for the proposition that a federal court is a proper substitute for a military tribunal when it comes to Article 5 proceedings. Indeed, we previously observed in
 
 Hamdi v. Rumsfeld
 
 that "it is anything but clear that the 'competent tribunal' which would determine [a person's POW] status would be an Article III court."
 
 See
 

 316 F.3d 450
 
 , 469 (4th Cir. 2003) (directing dismissal of
 
 28 U.S.C. § 2241
 
 petition challenging lawfulness of U.S. citizen's detention as enemy combatant),
 
 vacated on other grounds by
 

 542 U.S. 507
 
 ,
 
 124 S.Ct. 2633
 
 ,
 
 159 L.Ed.2d 578
 
 (2004). Moreover, Justice O'Connor's opinion in
 
 Hamdi
 
 recognized "that military regulations ... dictat[e] that [military] tribunals be made available to determine the status of enemy detainees who assert prisoner-of-war status under the [ Third] Geneva Convention."
 
 See
 

 542 U.S. at 538
 
 ,
 
 124 S.Ct. 2633
 
 (plurality opinion) (citing Army Reg. 190-8 at § 1-6).
 

 The scant authority supporting the notion that a U.S. court can be an Article 5 competent tribunal is not binding or even persuasive here. In
 
 United States v. Noriega
 
 , for example, a district court in Florida was confronted at sentencing with whether the captured former dictator of Panama, Manuel Noriega, was a POW.
 
 See
 

 808 F.Supp. 791
 
 (S.D. Fla. 1992). Although the court observed "that conducting foreign policy is generally the province of the Executive branch," the court did not acknowledge the U.S. military regulations assigning responsibility for Article 5 proceedings to military tribunals.
 

 Id.
 

 at 796
 
 . The court ultimately surmised that, because it was "properly presented with [Noriega's POW claim]," it was, "under the law, a 'competent tribunal' which can decide the issue."
 

 Id.
 

 The court offered no compelling legal rationale for that conclusion, however, and its ruling on Noriega's status-that he was a POW-was never reviewed by an appellate court.
 
 See
 

 Noriega v. Pastrana
 
 ,
 
 559 U.S. 917
 
 , 919 n.2, 921,
 
 130 S.Ct. 1002
 
 ,
 
 175 L.Ed.2d 1098
 
 (2010) (Thomas, J., dissenting from the denial of certiorari) (recounting that, "notwithstanding various separation-of-powers and justiciability concerns," the district court designated Noriega a POW, and the POW designation went unchallenged in later proceedings).
 

 In rejecting Hamidullin's POW claim, the distinguished presiding district judge relied on an Eastern District of Virginia colleague's decision several years ago in
 
 United States v. Lindh
 
 ,
 
 212 F.Supp.2d 541
 
 (E.D. Va. 2002). Like the POW ruling in
 
 Noriega
 
 , the
 
 Lindh
 
 decision was not appealed. In
 
 Lindh
 
 , the Government argued that Lindh, a U.S. citizen alleged to have fought for the Taliban, was not immune from criminal prosecution because the 2002 Presidential Statement had categorically excluded Taliban fighters from POW status under Article 4 of the Third Convention. The
 
 Lindh
 
 court observed that the 2002 Presidential Statement's Article 4 determination was subject to judicial review, but entitled to substantial deference.
 
 See
 

 212 F.Supp.2d at 556-57
 
 (explaining that such deference was "warranted given the President's special competency in, and constitutional responsibility for, foreign affairs and the conduct of overseas military operations"). Nevertheless, the court engaged in its own assessment of Lindh's POW status and determined that he failed to prove that Taliban fighters satisfy the criteria set forth in Article 4(A)(2).
 

 Id.
 

 at 557-58
 
 (concluding that, "even absent deference, the Taliban falls far short when measured against the four [Article 4(A)(2) ] criteria"). Like the district court here, the
 
 Lindh
 
 court failed to acknowledge Article 5 and its requirement for proceedings before a "competent tribunal," or Army Regulation 190-8 and its directive that Article 5 proceedings are to be conducted by a military tribunal.
 

 At bottom, the panel majority's view that a federal court may constitute the "competent tribunal" required by Article 5 of the Third Convention garners no support from controlling or even persuasive
 authority. More importantly, the majority's view defies the Convention and the United States' chosen scheme for making Article 4 POW determinations, as set forth in Army Regulation 190-8. Consequently, it is wrong for the majority to dismiss Hamidullin's quest for a military tribunal as an improper effort to strip the courts of jurisdiction.
 
 [6]
 

 2.
 

 The panel majority next invokes the 2002 Presidential Statement as a basis for rejecting Hamidullin's argument that Regulation 190-8 entitles him to have his Article 4 eligibility for POW status determined by a military tribunal. The majority explains that a remand to a military tribunal would "necessarily involve a reconsideration of President Bush's [categorical Article 4 determination]," and that it would be improper for this Court "to provide a three-member military tribunal with the authority to displace the president's interpretation of the Convention."
 
 See
 

 ante
 
 at 72-73;
 
 see also
 

 id.
 
 at 77 (Wilkinson, J., concurring) ("A military regulation cannot overcome ... the Commander-in-Chief's declaration that 'Taliban detainees are unlawful combatants and, therefore, do not qualify as prisoners of war' under the Third Geneva Convention ...." (quoting 2002 Presidential Statement at 2) ). In so doing, the majority unquestioningly accepts the 2002 Presidential Statement as a conclusive determination of the Article 4 question.
 

 Significantly, the panel majority does not acknowledge that the Government only belatedly invoked the 2002 Presidential Statement as dispositive of Hamidullin's Article 4 eligibility for POW status, precluding development in the district court of how much deference the Statement may be due. The majority also does not acknowledge that the Government has since taken inconsistent positions on the Statement's efficacy. Or that the Government's own expert witness condemned the Statement's Article 4 determination as "flawed" and "politically based rather than based on law."
 
 See
 
 J.A. 400. Or that the district court, and the
 
 Lindh
 
 court before it, declined to defer to the Statement in conducting their own Article 4 analyses. Or that the Statement's Article 4 determination has been questioned by the Supreme
 Court.
 
 See
 

 Hamdi
 
 ,
 
 542 U.S. at 550
 
 ,
 
 124 S.Ct. 2633
 
 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (observing that it "appears to be a violation [of Article 5 of the Third Convention]" and "at odds with [Army Regulation 190-8]" for the President himself to categorically withhold POW status from a captured person instead of convening a military tribunal to make an individual determination).
 

 Strikingly, the panel majority also does not explain why it can conclude that the 2002 Presidential Statement's Article 2 determination (that the war against the Taliban is an international armed conflict) has been implicitly abrogated, but no one can question the continuing force of the Statement's Article 4 determination (that Taliban fighters nevertheless cannot qualify as POWs). Particularly flummoxing is my good friend's separate opinion, wherein he accuses me of stubbornly and unreasonably ignoring the "many" "clear statement[s] from the Executive Branch on whether Taliban and Haqqani fighters should be accorded POW status"-including the 2002 Presidential Statement.
 
 See
 

 ante
 
 at 77 n.1 (Wilkinson, J., concurring) (internal quotation marks omitted). My friend emphasizes that the Statement's Article 4 determination "has never been rescinded, superseded, or modified," and he declares that "its relevance could not have been diminished in 2009" because, "by that time, the Taliban had been overthrown and the conflict had become a non-international armed conflict."
 

 Id.
 

 Of course, the Statement's Article 2 determination also has never been explicitly "rescinded, superseded, or modified," and it was made in 2002
 
 following
 
 the Taliban's ouster from power.
 

 In these circumstances, we are in no position to defer to the 2002 Presidential Statement's Article 4 determination. As such, the panel majority's embrace of the Statement is ill-advised and inappropriate.
 

 D.
 

 On a final note, I address the other supposed "clear statement[s] from the Executive Branch" identified by my good friend in his separate opinion.
 
 See
 

 ante
 
 at 77 n.1 (Wilkinson, J., concurring) (internal quotation marks omitted). They include the Government's initial appellate argument that the 2002 Presidential Statement's Article 4 determination is entitled to deference but not dispositive of Hamidullin's POW claim, and the Government's subsequent, inconsistent contention that the Statement conclusively renders Hamidullin ineligible for POW status.
 

 Id.
 

 (citing Opening Br. of Appellee 33-35; Suppl. Br. of Appellee 2). "The clearest statement imaginable," according to my friend, "is the prosecution of Hamidullin that began in 2014 and the conviction of Hamidullin defended by the government on appeal."
 

 Id.
 

 Contrary to my friend's characterization of "clear statement[s] from the Executive Branch," the Government has acknowledged that nothing in the record explains how or why Hamidullin was transferred from military to civilian custody, or how he ended up in Virginia. Meanwhile, the Government has not sought to supplement the record or otherwise provide an explanation that can be reviewed by this Court. As a former federal prosecutor, I know that if the Government could explain some satisfactory pre-prosecution process afforded Hamidullin, it would do so. I am not willing to accept that the mere fact of Hamidullin's prosecution guarantees that the Executive Branch properly considered his POW status-especially when the Government has seesawed between insisting, on the one hand, that the POW determination is for the courts, and on the other hand, that an
 unassailable Executive determination has already been made (via the 2002 Presidential Statement, or maybe the 2016 Presidential Report, or perhaps implicitly some other way). The Government is not infallible, and I will not heedlessly treat it as such.
 

 IV.
 

 Pursuant to the foregoing, I respectfully dissent from the panel majority's decision. Rather than affirming Hamidullin's convictions (as the majority does), or vacating those convictions (as Hamidullin wants us to do), I would remand this matter for the limited purpose of the Executive Branch's consideration and explanation of Hamidullin's POW status. In my view, unless and until the Executive resolves his POW claim, Hamidullin should be treated in accordance with the Third Geneva Convention and Army Regulation 190-8. The district court should also be authorized to conduct related proceedings, including proceedings on the status of the criminal judgment against Hamidullin pending the Executive's resolution of his POW claim; proceedings to review, if appropriate, any POW determination made by the Executive; and proceedings to ascertain, in the wake of any POW determination, the extent of Hamidullin's susceptibility to criminal prosecution and the validity of the criminal judgment against him. Until such remand proceedings are completed, we should hold in abeyance the balance of this appeal, including Hamidullin's other grounds for dismissal of the Indictment.
 

 With the utmost admiration for my distinguished colleagues, I therefore dissent.
 

 Our friend in dissent longs for "a clear statement from the Executive Branch" on whether Taliban and Haqqani fighters should be accorded POW status. Dissent at 32. We have many. The President stated very clearly in 2002 that the answer is no. And the government's briefing in this case states very clearly that its position remains the same.
 
 See
 
 Br. of U.S. at 27-41; Second Supp. Br. of U.S. at 2. If the dissent really wishes a clear statement, it has only to look underfoot. The clearest statement imaginable that Taliban and Haqqani fighters should not be accorded POW status is the prosecution of Hamidullin that began in 2014 and the conviction of Hamidullin defended by the government on appeal. Actions may or may not speak louder than words. But here we are fortunate to have both.
 

 The Executive Branch is free, of course, to change its position at any time. But it has chosen not to do so. The President's declaration that the Taliban are unlawful enemy combatants has never been rescinded, superseded, or modified. In fact, its relevance could not have been diminished in 2009, the year Hamidullin was captured attacking U.S. aircraft. For by that time, the Taliban had been overthrown and the conflict had become a non-international armed conflict. And our allies have recognized that fact and acted accordingly. The dissent's appetite for an additional "clear statement" will do nothing but sow confusion in a delicate matter of international relations and prolong this case indefinitely. Perhaps the dissent would heed an additional statement if it received one under its indefinitely elongated timetable. Or perhaps it would ignore it as it has every clear statement the Executive Branch has already offered.
 

 Finally, the dissent's proffer of the truism that the government is not always right adds absolutely nothing to the question in this case of whether the Taliban should be accorded POW status. All the smoke and mirrors fail to change in even minor particular the consistent view of all post-9/11 administrations, and of America's allies in the Afghan fight, that the Taliban collectively are unlawful enemy combatants and not entitled to the broad jurisdictional immunity from Article III courts that Hamidullin now claims.
 

 Citations herein to "J.A. ----" refer to the contents of the Joint Appendix filed by the parties in this appeal.
 

 Other aspects of the district court's Article 4 analysis also bear mentioning. The court treated Hamidullin's POW claim as an affirmative defense that Hamidullin bore the burden of proving. Rather than considering the characteristics of Hamidullin individually, the court focused on Taliban and Haqqani fighters generally. In any event, the court had before it only the sparse facts alleged in the Complaint and the "little [that] was said [during the evidentiary hearing] about [Hamidullin] as an individual military actor."
 
 See
 

 Hamidullin,
 

 114 F.Supp.3d at 386
 

 .
 
 When additional relevant evidence was adduced at trial, the court did not revisit Hamidullin's POW claim, including the issue of whether Hamidullin qualifies as a POW under Article 4(A)(2).
 

 Notably, Hamidullin invoked the
 
 Hamdan
 
 decision as support for his contention that the Article 2 question is for the Judiciary, not the Executive Branch. Upon examination, however,
 
 Hamdan
 
 engenders the opposite conclusion.
 

 The
 
 Hamdan
 
 Court also acknowledged Hamdan's argument that he was entitled to be treated as a POW under Article 5 of the Third Convention and Army Regulation 190-8 "until his status is determined by a 'competent tribunal.' "
 
 See
 
 548 U.S. at 629 n.61,
 
 126 S.Ct. 2749
 
 . Because the Court concluded "that Hamdan may not, in any event, be tried by the military commission the President has convened," the Court reserved "the question whether his potential status as a prisoner of war independently renders illegal his trial by military commission."
 

 Id.
 

 Although the panel majority confirms the district court's authority to render its Article 4 POW determination, the majority deems it unnecessary to review the merits of that determination (because the majority alternatively finds that the war against the Taliban was not an Article 2 international armed conflict by 2009). The district court's Article 4 analysis raises various questions, however, about the propriety of the proceedings and whether they were conducted in a manner consistent with that of a U.S. military tribunal.
 
 See supra
 
 note 3. For example, how could it be proper for the court to place the burden on Hamidullin to prove he is a POW? Shouldn't the court have considered the characteristics of Hamidullin individually, rather than focusing on Taliban and Haqqani fighters generally? Should the court have considered the additional relevant evidence that was adduced in Hamidullin's trial? To be sure, there also is doubt about the court's conclusion that Hamidullin is not within any Article 4 category.
 
 See
 
 Opening Br. of Appellant 23 (arguing that Hamidullin satisfies the requirements of Article 4(A)(2), as "the testimony at trial indicates that Mr. Hamidullin and his fellow soldiers were organized in a military command, wore distinctive clothing distinguishing them from the local population, openly carried arms, and did not violate the laws and customs of war");
 
 see also
 

 id.
 
 at 25-26 (separately contending that, as a member of the armed forces of Afghanistan's government-in-exile, Hamidullin is a POW under Article 4(A)(3), which "was designed to cover situations which had caused numerous problems during World War II with its many governments-in-exile," including Nazi Germany's refusal to accord POW status to forces of the Free French (internal quotation marks omitted) ).